REAM'S DRUG STORE *et al. v.* BANK OF THE MONONGAHELA VALLEY *et al.*

(Nos. 7886 & 7946)

RIVERSEAM COAL COMPANY *v.* BANK OF THE MONONGAHELA VALLEY *et al.*

(Nos. 7887 & 7947)

PURSGLOVE COAL MINING COMPANY *v.* BANK OF THE MONONGAHELA VALLEY *et al.*

(Nos. 7888 & 7948)

Submitted May 9, 1934. Decided May 22, 1934.

*George R. Farmer,* for appellants Lawhead, receiver, and W. C. Given, Banking Commissioner.

*Brown, Jackson & Knight,* for appellant Fidelity & Casualty Co. of New York.

68

*Donley & Hatfield, Robert T. Donley, Lazzelle & Lazzelle, John G. Zevely* and *George C. Baker*, for appellees Ream's Drug Store and others.

*Hunter & Price* and *Blue, Dayton & Campbell*, for appellee Riverseam Coal Co.

*Frank P. Weaver*, for appellee Pursglove Coal Mining Co.

HATCHER, JUDGE:

The defendant bank was closed by the state commissioner of banking on December 31, 1930. Plaintiffs severally made deposits of money in the bank between December 22-31, inclusive. They maintain that the deposits should have the status of trust funds on the ground that the bank was hopelessly insolvent during that period, and that its condition was known to its officials. From findings in favor of plaintiffs aggregating $33,488.00, the receiver of the bank appealed.

The Pursglove Company and the Riverseam Company causes were matured for hearing at the January term 1933 of the circuit court. No depositions having been taken by the several plaintiffs by the April term, the receiver then moved the submission of the two causes on bills and answers. The motions were overruled and the receiver charges error. Technically, the motions may have been timely. But we see no prejudice to the receiver from the ruling. The disposition of such motions is usually left to the sound discretion of the trial chancellor. *Riddle* v. *McGinnis,* 22 W. Va. 253, 268.

Counsel for the receiver takes the position that the evidence does not justify a finding of insolvency prior to December 31st. December 22nd was selected by plaintiffs as the beginning of the bank's insolvency because on that day a deputy commissioner of banking from the state banking department demanded and received in confidence the resignation of all officers and directors of the bank, and secretly remained in "complete charge" of the bank until it was closed. The circuit court based its finding on the bank's own financial statement as of

December 22nd (admitted in evidence by agreement of parties) in connection with testimony relating thereto not seriously controverted, as follows:

"Subject to such deductions as are proper, the total resources of the bank on December 22, 1930, as shown by the financial statement, aggregated $4,665,032.20. But it is proven conclusively that of those assets there were hypothecated to secure bills payable the sum of $769,879.00, which can not be treated as available assets, thus reducing the bank's resources to $3,895,143.20.

"It is also shown that O. S. Summers, assistant banking commissioner, a witness for the defense, was in close touch with the affairs of the bank during the last half of December, and during the last ten days was there almost, if not quite continuously, during which time, he, with John Nash of the banking department, made an. appraisal of the assets of the bank, reducing the estimated value of the bank's resources by $401,140.31. With this item deducted,—and the Court thinks properly so,—there would remain as of December 22, 1930, a net balance of the bank's assets, the sum of $3,494,212.89.

"The total liabilities of the bank, as shown by the same statement, were $4,665,032.20. But this includes the capital stock of $300,000.00, the surplus fund of $200,000.00, and the bills payable, amounting to $467,600.03, the latter secured by notes hypothecated for that purpose and deducted from the available assets of the bank. For the purpose of this suit the Court feels that these three items, aggregating $967,-600.03, should be eliminated from the liabilities as shown in the bank's statement, thus leaving a net liability of $3,697,432.17, as against available assets amounting to $3,494,212.89, or a deficit of $203,309.28; and this condition continued substantially the same until the bank closed on the afternoon of December thirty-first."

Counsel contend that while the opinion of the circuit court may show a theoretical insolvency (of 5%) during the period in question, the practical condition of the bank did not warrant the court's finding under a proper definition of insolvency.

This Court has seemingly not defined a bank insolvency. An ordinary debtor has been said to be insolvent under Code 1923, chapter 74, section 2, "when all his property is not sufficient to pay all his debts." *Wolf* v. *McGugin,* 37 W. Va. 552, 16 S. E. 797; *Carr* v. *Summerfield,* 47 W. Va. 155, 34 S. E. 804. Insolvency under the bankruptcy act is defined in *Arnold* v. *Knapp,* 75 W. Va. 804, 814, 84 S. E. 895, and the insolvency of a bank under a criminal statute is defined in Code 1923, 54-81a (8), neither of which definitions is applicable to this situation. Counsel for the receiver contends for the following definition of insolvency: "A bank is insolvent when the cash value of all of its assets realized in a reasonable time in case of liquidation as ordinarily prudent persons would close up their business, is not equal to its liabilities, exclusive of stock liability." Counsel for appellees offer this definition: "A bank is insolvent if it is unable to pay its debts in the ordinary and usual course of business." The latter definition conforms more closely to the expressions of this Court on insolvency and has the support of "the great weight of authority". *Parker* v. *Bank,* 96 Okla. 70, 220 Pac. 39. "The business of banking is one of trust and confidence, in which the deposit of money is solicited and received under an implied promise to return to the depositor its equivalent in cash upon demand. The question is not whether the assets (of the bank) * * * are of sufficient value to ultimately satisfy the claims of creditors in full. It is the settled rule in this state, as in other jurisdictions, that a bank is insolvent when it is unable to pay its depositors and other creditors in the usual and ordinary course of business." *State* v. *Childers,* 202 Iowa 1377, 1379, 212 N. W. 63, 64. Accord: Annotation 85 A. L. R. 812; 7 C. J., subject Banks and Banking, sec. 482; 3 R. C. L., subject Banks, sec. 120.

In addition to the facts stated by the circuit court it appears that after May, 1930, the bank had been unable to maintain the cash reserve required by law except with borrowed money; that the bank had borrowed $467,600.00 for that purpose, hypothecating the cream of its securities; that on December 22nd the bank had on its hands "frozen" notes and stock amounting to some $3,000,000.00; that it then made heroic efforts, both locally and outside of Morgantown, to obtain further loans without success, having naught to offer as security except what one witness describes as "long time mortgage notes"; that its checking accounts approximating $2,000,000.00 and the withdrawals on those accounts were normal during the period in question, but it could not have met the withdrawals "in the usual and ordinary course of business", and to do so resorted to unusual and extraordinary practices. "Whether or not a bank is insolvent constitutes a question of fact." *Cronkleton* v. *Ebmeier*, 38 Fed. (2d) 748. The circuit court has specifically found that the bank was insolvent. We are of opinion that the above circumstances support that finding and we cannot disturb it. 3 R. C. L., *supra*, sec. 271. We have not overlooked the testimony of several representatives of the banking department that they considered the bank *solvent* at the time it was closed. We apprehend that their definition of solvency is different from the one we have adopted. The representative who took charge of the bank on December 22nd, informed the directors "that the bank had been kept alive for the past two weeks on state funds and bills payable." (The state funds were then being checked out.) Another representative admitted that it was necessary at the date the bank closed for it to have additional funds to meet the demands of depositors, and that there was no immediate prospect then of securing such funds. A representative also testified that statistics showed that prior to the last business depression "the assets of a bank would depreciate from 25 to 33 1/3 per cent by the mere fact of closing; today * * * they depreciate at the rate of 50% as a minimum." It is unthinkable that the banking department, with knowledge that clos-

ing the bank would cause its utter collapse (by depreciating its assets 50%), would have done so had they believed it could have paid its debts in the ordinary course of business.

None of the bank's executives who were actively in charge of its business testified that they considered the bank solvent during the period in question. There were fifteen members on the board of directors, *twelve of whom did not testify*. The failure of the twelve directors, and the failure of all the executive officers, to say that they had faith in the bank's solvency during December, 1930, is significant. The circuit court held that if the directors and officers of the bank were unaware of its condition prior to December 22nd, the announcement then made to them by the representative of the banking department was "sufficient to put them on inquiry to say the least". The court continues:

> "The fact that O. S. Summers from the banking department was there almost continuously during the last half of December, keeping silent watch on deposits and withdrawals, with John Nash from the banking department there and assisting Summers in checking up on the available assets of the bank; with Mrs. Barringer from the banking department there and 'in complete charge', should have driven home to the officers and directors a knowledge of the tremendously perilous condition of the bank during the last days of December. The Court can only assume that they were lulled into hopeful security by the desperate efforts being made by the department officials to save the bank from utter ruin, and during which time the unsuspecting 'general public' was to understand that there was 'nothing unusual in the management of the bank', and in consequence of that understanding continued to make their deposits until the doors of the bank were literally closed in their faces. The court can not but hold that the management of the bank must be charged with knowledge of the bank's hopeless condition during the last days of December, and the inevitable failure which followed."

The opinion of the circuit court is ample in this respect, but it may be supplemented somewhat by the following circumstance: A committee of the directors applied for aid to the Mell-Bank Corporation of Pittsburgh ("a corporation organized to help banks in distress") and presented the financial statement of the defendant bank to an executive officer of the Pittsburgh Corporation. After five minutes examination of the statement, he refused aid, saying: "Gentlemen you should go home, and lock that bank up at once, if it was our bank we would lock it up, it is frozen." If the bank's financial statement itself so readily disclosed a frozen condition, then the only apparent reason for any director not being informed is that he closed his eyes to what was obvious. The three directors who testified relied on conferences with two men not connected with the bank (one shown to have been insolvent at the time) each of whom held out hopes of a financial rescue. But as said by the Supreme Court of New York, good faith towards the plaintiffs required more support than mere hope of such rescue. See *Rochester Co.* v. *Loomis,* 45 Hun. 93, 99. Hope is a most potent factor in business as well as in the other affairs of life; but hope will not sustain a bank when credit is gone. "Insolvency is a condition unaffected by intentions or hopes of persons affected." *Steele* v. *Randall,* 19 Fed. (2d) 40. Proof is not requisite that the directors admitted or had actual knowledge of the bank's insolvency. Such a requirement would put a premium on inattention to duty. "Directors cannot in justice to those who deal with the bank, shut their eyes to what is going on around them. * * * That which they ought by proper diligence to have known as to the general course of business in the bank they may be presumed to have known." *Martin* v. *Webb,* 110 U. S. 7, 15, 28 L. Ed. 49.

Counsel for the receiver contends that at most the insolvency of the bank was simple and not irretrievable and therefore the deposits made during the period in question are not trusts *ex maleficio.* The degree of the insolvency is also a question of fact which the circuit

court has resolved against the contention of counsel. The events heretofore narrated support that finding. A court may look to the history of a bank subsequent to closing on the question of prior insolvency. *Babka Co.* v. *Bank,* 264 Ill. App. 142, 160; *Federal Bank* v. *Idaho Ass'n.,* 8 Fed. (2d) 922, 927. How hopeless was the insolvency of the instant bank is demonstrated by the fact that after some three years of the receivership, the preferred deposits had not been fully satisfied and nothing whatever had been paid on the common deposits.

It is the general rule that such circumstances as attended the making of these deposits constitute the bank a constructive trustee of the depositors. *Supervisors* v. *Bank,* 138 Va. 333, 121 S. E. 903; Annotations, 20 A. L. R. 1206, 81 A. L. R. 1078, and 2 R. C. L., Perm. Supp., page 840. There is conflict of authority on the question of identification of trust money. No purpose would be served by arraying the divergent decisions. It has been the rule in this jurisdiction from early days that "when the relation of trustee and *cestui que trust* is once established, no subsequent dealing with the trust property by the trustee can relieve it of the trust as between him and his *cestui que trust.*" This Court said in *Murray* v. *Sell,* (1884) 23 W. Va. 475, 480-1, that the rule was *too well established to require argument.* So long as the trust fund may be identified either as the original property *or its product,* equity will pursue it. *Marshall* v. *Hall,* 42 W. Va. 641, 644, 26 S. E. 300. Thoroughly consistent with these pronouncements is "the better rule", given by Michie, as follows: " * * * according to the better rule the plaintiff may follow and reclaim a deposit which is impressed with the character of a trust fund, even though it has been mingled with other funds of the bank so that the identity of the deposit is lost, provided it has passed into and swelled the funds of the bank. And the doctrine that one can not follow trust money mixed with other money in an indistinguishable mass, because of its having no ear-mark, must be taken subject to the application of this rule. It is not important that the

commingled money bore no mark, and can not be identified. It is sufficient to trace it into the bank's vaults and find that a sum equal to it, and presumably representing it, continuously remained there until the receiver took it. The modern rules of equity require no more." 3 Michie Banks and Banking (1931) sec. 203. Accord: Annotation, 82 A. L. R. 125; 65 C. J., subject Trusts, sec. 900.

Most of the plaintiffs had deposits in the bank on December 22nd and checked against their accounts between December 22-31. The circuit court permitted such checks, where possible, to be charged against the balances of December 22nd under the conventional doctrine of "first in first out". An incautious use of the doctrine would give some depositors an undue potential advantage. Say for exemple a depositor had $1,000 on deposit before the insolvency period of a bank; during that period he deposited $1,000 more and withdrew a like amount. Under the "first in first out" docrine, this depositor would have withdrawn his $1,000 for which the law gave him no special security and would have the preference of a trust fund for the remaining $1,000. Now take another depositor who had on deposit $2,000 when the insolvency commenced and who neither increased nor diminished his deposits. The latter depositor had placed the same amount with the insolvent bank as the former, but the latter would have no prference whatever for any part of his funds. The "first in first out" doctrine is opposed in this instance by the presumption that the bank would apply to the use of its depositors as rapidly as possible the money it had wrongfully received. The presumption may have little strength, but the doctrine is admittedly "a pure fiction" invented for convenience. With all its weakness, we are of opinion that the presumption will lead to less harm in these causes than the fiction.

The circuit court refused to regard as a trust deposit, the deposit of a check drawn on the defendant bank itself. We approve that ruling. It is requisite that the

assets of the insolvent be in some way augmented by the deposit in order to constitute it a trust. 53 C. J., subject Receivers, sec. 414. There was no augmentation of the insolvent's assets from a check drawn on itself. The transaction was a mere shifting of credits on the books of the bank. Its assets were neither increased nor depleted.

When the banking commissioner closed the bank on December 31, 1930, he simultaneously appointed C. E. Lawhead receiver, who at once qualified as such. For reasons not apparent, the receiver did not receipt to the banking department for the assets coming into his hands until January 15, 1931, on which date the cash assets of the bank amounted to $5,639.13. Counsel for the receiver contends that the deposits of the plaintiffs were dissapated before the receiver took charge. During the period between December 31st and January 15th, the affairs of the bank were in the personal charge of L. D. Griffin, an assistant commissioner of banking. Both Mr. Lawhead and Mr. Griffin were appointed by and were responsible to the banking commissioner and both were officials of the banking department. This relationship would seem sufficient to show that Mr. Griffin was acting on behalf of Mr. Lawhead. The bill of the Ream's Drug Store alleges that Mr. Griffin was appointed assistant receiver of the bank and "that said receiver and assistant receiver took possession of said bank its assets books and papers." The answer of Mr. Lawhead admits that allegation. So we conclude that the possession of Mr. Griffin was that of Mr. Lawhead. When the bank closed on December 31st, cash assets amounting to $163,902.40 passed into Mr. Griffin's hands. The question of dissipation is to be measured by the cash assets of December 31st rather than those of January 15th.

However, in making that measurement, other trust funds must be considered as well as those of the plaintiffs. On December 31st the bank owed to other parties $113,980.87 in express trusts. On December 22nd the bank had on deposit $293,376.42 due the State of West Virginia. The bank had given bonds for this deposit

aggregating $220,000.00. So there was then on deposit $73,376.42 in excess of the bonds and that excess became a trust fund. *Reichert* v. *Bank*, (Mich.) 239 N. W. 393, 82 A. L. R. 33; *County Court* v. *Bank*, 112 W. Va. 476, 164 S. E. 659. Between December 22-31, the state deposited $412,657.00 and withdrew $200,581.00, leaving a balance of $212,076.00 deposited during that period. That balance is just as much entitled to be considered a trust fund as any other deposit made December 22-31. That balance and the excess above the bonds on December 22nd ($73,376.42) make a total of trust funds due the state on December 31st of $285,452.42. Since that date the receiver has paid the state $110,000.00, reducing the balance to $175,452.42. Under the common law and under the decisions of this jurisdiction, the prerogative right of the state requires that its trust funds be given precedence over the other trust funds. *Woodyard* v. *Sayre*, 90 W. Va. 295, 110 S. E. 689. Where the state's right and that of a citizen meet at one and the same time, the state is preferred. *County Court* v. *Mathews*, 99 W. Va. 483, 487, 129 S. E. 399. Under that requirement we must hold that the deposits of the plaintiffs had been expended by the bank prior to closing, since the $163,902.40 in cash assets then on hand was not enough to satisfy the trust claim of the state.

The fact that the cash assets of December 31st are not sufficient to include the funds of plaintiffs does not necessarily show that the plaintiffs' deposits were dissipated. If their deposits were used to purchase anything (including the release of the bank's collateral) which went into the hands of the receiver, they may subject to their demands the product of that purchase. *Marshall* v. *Hall, supra;* 65 C. J., subject Trusts, sec. 909; Annotation, 82 A. L. R., pp. 71 and 120.

The sureties of the bank have paid the state $220,-000.00 (with accumulated interest) since the bank closed. We are of opinion that such payment should be treated as a payment *pro tanto* of the deposit ($293,-376.42) in the bank on December 22nd. One of the sureties, Fidelity & Casualty Company, paid $20,526.22 (the

full amount of its bond) to the state and has intervened in these proceedings asking to be subrogated to the extent of its payment, to the right of the state as a *cestui que trust*. The circuit court limited the intervenor to subrogation to the preferential right of the state.

The deposits of the state prior to December 22nd, within the amount of the bonds, were simply entitled to a preference over the common depositors. The deposit of the state before December 22nd in excess of the bonds and all its deposits after December 22nd, must be regarded as trust funds. The trust funds will be accorded priority in payment over *preferred* deposits. As this surety is a paid surety, undertaking the risk for the premium received, it would seem only fair to hold that the surety assumed the greater of the two risks which confront the funds of the state. And here again, the right of the state and the right of another (the surety) meet, and the prerogative right of the state demands that the surety be relegated to the lesser security (the state's preference over common depositors). This view is consonant with the written assignment upon which the surety bases its intervention. The state treasurer regarded the entire balance (of some $500,000.00) due the state on December 31st, as a *preferred claim,* and specifically assigned to the surety the right of the state (to the extent of the surety's payment) "in and to its said preferred claim against" the bank.

Therefore we affirm the rulings of the circuit court relating to the intervenor. We affirm the findings of the circuit court on the question of insolvency. We reverse the amounts decreed as trust funds so far as based on the "first in first out" doctrine. We consolidate and remand the causes, that they may be referred to a commissioner, who after due advertisement to all the depositors, may take and state an account.

*Affirmed in part; reversed in part; remanded.*