The court is advised that an appeal has been taken from its final decree. In view of the court's informal memorandum filed at the conclusion of the proofs, it is deemed appropriate that the facts and the law of the case be more fully stated. In doing so the exposure of the fraud which the incompetent, Joseph L. Rein, practiced upon his elderly sister for about eight years before he became mentally deranged, is unavoidable. That fraud is a most shocking one. It stripped the complainant of her last dollar and left her, in her old age, wholly destitute. The fruits of that fraud the defendant Joseph L. Rein added to his own estate.
The controlling facts cannot be said to be in dispute They were established by the testimony of two credible witnesses, *Page 586 
were supported by documentary evidence, and were not denied either in the answer or the defendants' proofs at the hearing. It was made very clear at that hearing that the defendants rested entirely upon the single defense contained in the answer, namely, that of the statute of limitations, although when the proofs were all in the further point was raised by the defense that the complainant had an adequate remedy at law, the latter being an objection not reserved in the answer but one which had previously been disposed of on a motion to strike.
The complainant is a woman past seventy who has for many years resided at Philadelphia, in the State of Pennsylvania. In October of 1931 she was possessed of $3,000, which she kept on deposit at the Philadelphia Saving Fund Society, a banking institution. That account was maintained in the name of her daughter, Rose, but it is proved by the testimony of both mother and daughter that these funds were the property of the mother and represented her life's savings. Several banks having closed in Philadelphia — two in one day — the daughter sought the advice of the defendant Joseph L. Rein, who lived in Newark, was engaged in business and was a man of means and investment experience. Upon being informed of the banking situation in Philadelphia, he advised complainant's daughter to remove the money from the Philadelphia Saving Fund Society and to put it into a safe deposit box. He stated that he didn't trust the banks and he further advised that the withdrawn funds be converted into gold. That advice was followed. On October 21st, 1931, complainant withdrew from the bank $1,000 in cash and on November 10th of the same year withdrew the further sum of $2,000. This withdrawal was made in two installments for the reason that the bank declined to pay more than $1,000 on the occasion of the first withdrawal. The full $3,000 was converted by the daughter into gold coin and deposited for safekeeping in a vault or safe deposit box at Gimbel Bros. department store in Philadelphia. That box was rented on October 23d 1931, two days after the first withdrawal, during which two days the withdrawn currency was converted into gold coin. That gold was kept in the box at Gimbel Bros. until shortly *Page 587 
before Christmas of 1931. About the middle of December of that year, Joseph Rein came to Philadelphia to visit with his sister, the complainant. He urged her to take the money from the vault and to turn it over to him for the purpose of investing it in a first mortgage on real estate in Newark, New Jersey, advancing as a reason for such investment that her money would earn for her six per cent. a year and would be productive instead of lying idle in a safe deposit box where the complainant could draw the money down at will and thereby dissipate it. Mrs. Livingston was hesitant about making the investment. She knew nothing about Newark real estate and couldn't look after collecting the moneys under the mortgage and so told him. The defendant assured her against any concern in the matter. He told her. "You don't have to worry anything about the interest. I will invest the $3,000 in a first mortgage in your name. I will open a bank account in your name. I will deposit the interest and you shall have this money as an old-age fund." Complainant then posed to her brother the problem which would arise if she wanted some money before such mortgage became due and at a time when perhaps the mortgage had some years to run before payment would be due thereunder. The defendant assured her to have no worry about it saying: "I shall personally guarantee it. If at any time you want any money, all you have to do is write and ask me." The daughter thereupon inquired whether the defendant was willing to sign a "guaranty" of the investment and upon her being assured that the defendant was willing to do so, she prepared on her typewriter what she believed to be a "guaranty." She used the common form of a promissory note but affixed to it a seal and made provision for the signature of an attesting witness. That instrument the defendant then and there signed and at the same time the $3,000 in gold coin was delivered to him and counted by him in the presence of his sister and niece. The money was delivered to him by complainant on January 15th, 1932, the day he left Philadelphia to return to his home at Newark, and by the instrument which he at the same time delivered to his sister, dated the same day, he bound himself upon her demand to pay her $3,000 with *Page 588 
interest at six per cent. He promptly misappropriated the moneys entrusted to him for the mortgage investment and successfully concealed that fact until discovery resulted from a search of the public records, made shortly before the filing of the bill herein. The search revealed that at no time since 1932 had there been in existence in Essex County any mortgage for $3,000, or for any other sum, in the name of Joseph L. Rein, trustee for the complainant, or in his name as trustee for any undesignated person, or in the name of the complainant herself. Nor was it claimed by the defense that Joseph Rein ever made any investment in the name of the complainant or for her benefit. What unquestionably happened is that Joseph Rein commingled with his own funds those moneys given to him to invest on mortgage for and in the name of his sister and that the misappropriated money is reflected either in the more than $10,000 in cash which the guardian in lunacy took over or in the several parcels of real estate acquired by the lunatic during the years preceding his incompetency.
Notwithstanding the fact that Joseph Rein had otherwise used the trust funds, he reported to his sister that he had invested those funds in a first mortgage on Newark real estate taken in her name. Several times he was asked for the bond and mortgage and each time he represented that he had those securities in a safe deposit box and would bring them down to Philadelphia on the occasion of his next visit. Complainant did not insist upon delivery of the bond and mortgage, for both she and her daughter had, as they testified, implicit confidence in the defendant. I can well understand this. The relationship between these parties was an intimate one and continued confidence in the defendant's pledged word was stimulated by the circumstance that on two separate occasions complainant asked for some money out of her investment and the defendant promptly remitted, $315 in September of 1936 and $200 on June 28th, 1938. Also at various times the daughter Rose found herself in need of funds, which the defendant readily loaned her and which she repaid. I am satisfied that complainant had no occasion to suspect any fraud on the part of her brother until it became *Page 589 
an assured fact that he had never made for her the promised investment in a first mortgage on Newark real estate.
The force of complainant's oral proofs and documentary evidence was sought to be met by an offer of a number of letters written by the daughter Rose to her uncle, the defendant. After reading these letters I sustained the objection to the offer. There was nothing in any of the letters which in the remotest manner touch the subject of the fund turned over by complainant to her brother for the purpose of investment; nor, indeed, could the daughter make any admission binding on the complainant.
The transaction between the complainant and the defendant Joseph L. Rein was one that gave rise to a simple express trust. That trust did not have to be manifested in writing, since it concerned only personal property. Hudson Trust Co. v. Holt,115 N.J. Eq. 34 (at p. 38), and numerous cases there cited. For his breach in failing to make the stipulated investment and for his fraud in using the funds for himself the trustee was liable at all times for the trust moneys, together with any profit which the trustee made therefrom in his own personal business ventures or investments, but only if the trust funds could be traced. Complainant's efforts in this direction failed and she is confined to the recovery of the trust money plus lawful interest thereon for and during the period of misappropriation, less an appropriate credit for the two remittances made by the trustee. Dismissal of complaint's bill was sought on the ground that there was available to her a remedy at law, because, as the defense claimed, the transaction between the parties merged into a promissory note. In other words, the defendants contended that the trust character of the transaction and the trust relationship between the parties ended when the promissory note was given and accepted. This undoubtedly would have been true if the parties had intended the transaction to be one for the lending of money to be evidenced by Joseph Rein's personal note. That was never the intention of the parties. Quite the contrary. The continuing promise and obligation of the defendant was to invest the money in complainant's name in a first mortgage on Newark real estate. The defendant's *Page 590 
repeated representations that he had actually done so and his assurance that he had complainant's bond and mortgage in his own safe deposit box and that he would deliver them to complainant clearly demonstrate the true nature of the transaction. The note was drawn under the mistaken notion that it in form constituted a "guaranty" and was so understood and intended by the parties. It may be so regarded here but I rather view it as collateral security furnished by the trustee to the cestui to enable her to call upon him for part or full payment of the investment should the cestui's need therefor arise at any time when, because of immaturity, the investment itself could not be liquidated. Nothing else was intended by the parties and the furnishing of that note did not absolve the trustee from his obligation to invest the trust moneys in accordance with his undertaking nor relieve him from his duty to account, in equity, when called upon to do so. A somewhat similar situation was present in the case of Gutch v. Fosdick, 48 N.J. Eq. 353;22 Atl. Rep. 590. That was a suit against an administratrix to declare and enforce a trust with respect to a sum of money deposited with her intestate, to be invested for the use and benefit of the complainant. Some years after the moneys had been so delivered the trustee executed a certificate which had all the attributes of a promissory note. It certified that the intestate held $4,000 for the complainant, for which the intestate agreed to pay interest and promised to refund to the complainant the principal sum on demand. The bill charged that those moneys had been used by the intestate for the betterment of his own estate and it sought a lien on that estate and a decree that the administratrix pay the same, with interest, out of the estate. On demurrer to the bill it was argued that the instrument was a mere promissory note, payable on demand, which might have been sued upon at law and that in such a suit the statute of limitations would have been a bar to recovery. Because of the presence therein of words indicating an intention to create a trust relationship, Chancellor McGill construed the instrument as a declaration of trust and not one standing upon the footing of a promissory note which treats of the payment of an indebtedness. *Page 591 
He held that the instrument manifested a "deposit in continuing trust" until the cestui should, by demand for payment, determine the trust. In this view of the case the Chancellor said (at p. 355): "* * * There can be no question as to the jurisdiction of this court in the enforcement of this trust. It may be that it may also be enforced at law (1 Story Eq. Jur.58), but the fact of the existence of such concurrent remedy does not oust the complainant of her right to proceed in equity." Citing Kane v. Bloodgood, 7 Johns. Ch. 90. See opinion of Mr. Justice Heher in Capraro v. Propati (Court of Errors andAppeals), 127 N.J. Eq. 419; 13 Atl. Rep. 2d 318, where trusts which are "technical and continuous in their nature" are said to be within the exclusive jurisdiction of equity and where it is also held that there is another class of cases which is within the concurrent jurisdiction of law and equity, of which latter class the Gutch Case is one. I see no difference in principle between the instant case and the Gutch Case. There the intent to create a continuing trust could be gathered from some of the words in the instrument; in the instant case the like intent was clearly and unmistakably expressed at the time the trust funds were handed over and their use for a limited and defined trust purpose was expressly stated as a condition for their delivery to the defendant Joseph L. Rein.
The defense of the statute of limitations is wholly without merit. The statute has no application to express trusts and this has been the rule in this state since the decision in Hedges v.Norris, 32 N.J. Eq. 192. It was also said in Gutch v.Fosdick, supra (at p. 356): "That the trusts intended by the courts of equity, not to be reached or affected by the statute of limitations, are those technical and continuing trusts which arenot at all cognizable at law, but fall within the proper, peculiar and exclusive jurisdiction of this court." It might also be stated that if the statute were at all applicable, its use as a bar is not available to the defendants here. Because the defendant Joseph L. Rein fraudulently appropriated to his own use the trust funds and concealed that unlawful conversion, the statute would not in *Page 592 
equity, begin to run until the discovery of the fraud. The defendant would not be permitted to avail himself of a delay induced by his own concealment of the fraud. Partrick v.Groves (Court of Errors and Appeals), 115 N.J. Eq. 208;169 Atl. Rep. 701.
There is one other circumstance that finally disposes of the plea of the statute of limitations. It is not denied that the defendant Joseph L. Rein made two payments in the transaction to the complainant, one in September of 1936 and the second on June 28th, 1938. Even if the statute of limitations could be invoked in the case of an express trust, these payments have the effect of preventing the bar of the statute, for both payments were made within six years before the commencement of this suit. The point is so well settled in this state that no authority need be cited for the holding that a part payment within the time limited by statute for suit operates to toll the statute.
Another matter calls for mention. A corroborating witness for the complainant was her daughter Rose, whose testimoney was convincing. She gave no cause to doubt her credibility but at the hearing the defendants questioned that credibility. Thereupon, in rebuttal, complainant offered in evidence the original will of the defendant Joseph L. Rein, made while he was yet competent. By that will he left his entire estate to the witness. Complainant's counsel, in making that offer, stated that it was designed to meet the attack on the witness' credibility, because by testifying in support of complainant's claim the witness was testifying against and not in favor of her own interest. The point was pressed that to the extent of any recovery allowed to the complainant the estate which would ultimately come to the witness would be depleted. The offer was objected to as immaterial. I allowed the will in evidence, but upon further consideration of the case and before announcing my decision I determined to disregard the will entirely. When the defense had rested I entertained not the slightest doubt concerning the credibility of that witness. She had not been the sole witness to the transaction. That transaction had been independently established by the testimony of the complainant herself, who, *Page 593 
notwithstanding her difficulty with the language, was scrupulously careful in her testimony. Upon complainant's testimony alone, unaided by the corroboration furnished by the daughter, I would have reached the same findings of fact. The will of Joseph L. Rein added nothing to the proofs and had no influence upon my mind.
A decree was advised enforcing the trust in the amount of the misappropriated trust funds and interest thereon, directing the defendants to pay the same and impressing a lien therefor upon all the assets and property of the defendants.