[File No. 7140]

## GEORGE E. ENGSTROM and Ella Engstrom, Plaintiffs, v. BETTY LARSON and C. R. Larson, Defendants.

(44 NW2d 97)

Opinion filed September 12, 1950

Opinion of the court by *Christianson,* J.
*Sinness & Duffy,* for appellants.

*Burtness & Shaft,* for respondents.

CHRISTIANSON, J. This is an action for an accounting between partners. The trial court rendered judgment for the plaintiffs in the sum of $2030.16. Plaintiffs claim that the amount awarded was inadequate and appeal from the judgment and demand a trial anew in this court. The defendants on the other hand claim that the amount awarded to the plaintiffs was excessive and they also appeal from the judgment and demand a trial anew in this court.

In 1944 the Columbia Hotel building in the City of Grand Forks had been owned for a number of years by Claude P. Stone and D. F. McGowan. Claude P. Stone also owned and operated the Fort Hotel in the City of Fargo in this state. The plaintiff George E. Engstrom was employed by Stone and worked for him at the Fort Hotel in Fargo having commenced to work there in 1938. Stone and McGowan operated the hotel business proper known as the Columbia Hotel at Grand Forks and in January 1940 they employed the plaintiff George E. Engstrom as manager of the Columbia Hotel. A cafe and a beer parlor were being operated in the Columbia Hotel building. The beer parlor was operated by D. F. McGowan and his son, Robert, and the cafe was operated by one Alex Argeros. In 1944 Argeros saw the plaintiff Engstrom and stated that he had decided to get out of the business for various reasons then stated with the result

the plaintiff Engstrom and Stone entered into a partnership to acquire and operate the cafe business. They paid Argeros $1200 for the cafe and equipment and $555 for supplies and merchandise on hand to be used in the operation of the cafe. On October 3, 1944, Argeros executed and delivered a bill of sale whereby he sold and transferred the cafe and equipment to George E. Engstrom and Claude P. Stone. Argeros was paid with checks issued by Claude P. Stone payable to Argeros aggregating $1755. George E. Engstrom and Claude P. Stone executed their note payable in one year to Claude P. Stone and Betty Stone for $1900. This note was executed and delivered for the monies which Stone had advanced to pay Argeros and also for $145 which was turned over to the plaintiff Engstrom for operating expenses. This note was later paid in full from the income or profits of the cafe business. The plaintiff Engstrom served as manager of the cafe and also continued.to serve as manager of the hotel. He received no compensation for his services as manager of the cafe and this arrangement continued until August 1946 when Engstrom was relieved of his duties as manager of the hotel and thereafter devoted his full time to his position as manager of the cafe for which service he was paid $200 per month. About January 2, 1946, Ella Engstrom, the wife of plaintiff George E. Engstrom, and Betty Stone, the wife of Claude P. Stone, were taken into the partnership and George E. Engstrom and Claude P. Stone transferred the cafe property to McGowan by written instrument duly executed and delivered; McGowan in turn transferred all the cafe property and equipment including the good will of the business in the name of the Columbia Cafe to Claude P. Stone, Betty Stone, George E. Engstrom, and Ella Engstrom. At some time, the date not being disclosed by the record, Claude P. Stone placed his half interest in the hotel business in the name of himself and his wife Betty Stone as joint tenants. Claude P. Stone died on September 23, 1946. The Columbia Cafe business continued to be operated as before with Betty Stone receiving one-half of the profits as owner of one-half of the business. The plaintiff George E. Engstrom continued to serve as manager of the cafe

as before. His wife, the plaintiff Ella Engstrom, performed certain services such as handling ration stamps and at times when it was necessary serving temporarily as cashier but did not claim or receive any compensation therefor. In March 1947 Betty Stone married the defendant C. R. Larson, and thereafter he represented his wife in some of the partnership matters. During March 1947 the plaintiff Engstrom became interested in and purchased a hotel at Carrington in this state. He ceased to serve as manager of the Columbia Cafe on or about April 1, 1947, and went to Carrington to look after the hotel property. The plaintiff Ella Engstrom then became and thereafter served as manager of the Columbia Cafe. There is a conflict in the testimony of the parties as to what, if any, negotiations were had between the Engstroms and the Larsons relating to Ella Engstrom serving as manager of the cafe. The Engstroms testify that the Larsons were informed of Engstrom's plan to go to Carrington and that his wife, Ella Engstrom, would take over and serve as manager of the Columbia Cafe, and that the Larsons agreed to this plan. The Larsons testify they were not notified of Engstrom's plan to go to Carrington and had no information concerning it until they were informed in a letter from Ella Engstrom, which Mrs. Larson testifies she received in Fargo on March 24, 1947. The trial court found: "That about April 1, 1947, the Plaintiff George E. Engstrom retired as manager of the cafe and purchased a hotel at Carrington, North Dakota, and by mutual consent of the partners the plaintiff Ella Engstrom took over the management of the cafe business."

The evidence shows that regardless of whether the proposed action of George E. Engstrom had been discussed between the parties, early in April 1947 the Larsons with knowledge of what had transpired consented that Ella Engstrom serve as manager of the cafe. In his direct examination the defendant C. R. Larson testified: "About a week after he (George E. Engstrom) left I came to Grand Forks, and Mrs. Engstrom had been running the restaurant for a week, and then we discussed the matter of her continuing on as manager of the cafe, and I told

her I didn't think she would be capable of showing a profit due to the fact the cafe business is a highly specialized business, and experienced people did not make very much of a success in operating the restaurant, but she wanted to try it, and we agreed she should try it for a few weeks and see what she could make of it."

Ella Engstrom continued to operate the cafe business as before. She deposited the monies that were received, signed checks for the payment of bills and made daily reports to Fargo. She continued in such active management until June 10, 1947, when she was called to Valley City by the serious illness of her mother. She testified she was called about 8 o'clock at night, and told that her mother would not live through the night, that she made the necessary arrangements for help and supplies for the carrying on of the business and went to Valley City that same evening. That her mother died shortly after she arrived in Valley City and that both Mr. and Mrs. Larson attended the funeral on Saturday, June 14th. That after the funeral she and the Larsons met and conversed and that Larson then presented to her certain blank checks to be used in paying bills and expenses and that she signed the same and turned them over to Larson. That nothing was said at that time about any proposed sale or closing of the business. This latter statement is in a measure corroborated by Betty Larson who when asked whether at that time they talked with Mrs. Engstrom about the situation in the restaurant answered, "we did not discuss it at the time. It did not seem the time to discuss it there. We asked her to come back and we came back here."

It is not altogether clear as to what transpired between the parties after the meeting at Valley City on June 14th until they later met in Grand Forks. There is testimony by the defendants that they called her. The undisputed testimony shows that Ella Engstrom did come to Grand Forks and that she and Mr. and Mrs. Larson met there on June 19th and that they then had a conversation regarding their affairs. Mrs. Engstrom testified:

"I found—when I talked to the Larsons that evening they told me I had no further interest in the business, . . ."

"They told me I had no further interest in the business. Mr. Engstrom's removal from Grand Forks had eliminated him, and I had been working for them, alone, and I had no interest in the Columbia Cafe."

"They told me they were selling out, and if I didn't consent to that why they would close the doors that night, and the cafe would be no longer operating. I had nothing to do with it from the time I came back until now."

"Q. Did you have anything to do with making the sale of the property?

A. I knew nothing about it whatsoever until they notified me that night, but I did see the Olivers around there, and I understood they had purchased it.

Q. Did you and Mr. Engstrom receive any part of the purchase price paid by the Olivers?

A. None whatsoever.

Q. The Larsons have made no accounting whatsoever to you or Mr. Engstrom with reference to the sale of the property.

A. None."

On her direct examination Mrs. Larson testified concerning the conversation then had between Ella Engstrom and herself as follows:

"I told her (Ella Engstrom) we were going to close up. I asked her if she would pay one-half of the loss that had been incurred, and she said no."

She further testified:

"Q. Did you advise her at that time you were going to sell the business?

A. No, I didn't know what we were going to do. I knew we were closing.

Q. And you did close?

A. Yes.

Q. You took an inventory, then what happened?

A. We closed it.

Q. Then you later sold it to the Olivers?

A. That is right."

The undisputed testimony shows that Ella Engstrom assisted Smith, an auditor of the defendants, in taking an inventory of supplies of food and merchandise then on hand. in the cafe. Smith testified that such audit was taken on June 19th and that the cafe closed on June 21st. Ella Engstrom testified she assisted Smith in taking the inventory, that they worked until midnight and that on the following morning she assisted Smith and his assistant in making up the price list and determining the amount of stock on hand. She further testified that the cafe was in possession of the Olivers, that Mrs. Oliver was in the kitchen, that she saw her there.

On his direct examination Oliver testified: '

"Q. Are you able to tell what date you purchased the Columbia Cafe?

A. About June 23, I believe it was, 1946—no, 1947.

Q. And the consideration which you paid for the cafe, the equipment, fixtures, dishes, and the lease which you secured—what was the total consideration?

A. $20,000.

Q. In addition to that you paid $1056.74 for the inventory of supplies, is that correct?

A. Correct.

Q. In the purchase of the property in paying $20,000. for it, did you segregate, insofar as your deal with the Larsons was concerned, did you segregate the amount that you paid for the various items within the term equipment and fixtures, or did you just make one total payment of $20,000?

A. Just made one total payment of $20,000."

"Q. In arriving at the figure of $20,000., will you tell the Court what value you placed upon the equipment which was in the cafe, and what value you placed upon the right to secure the lease of the premises?

A. Well, insofar as we tried to break it down at all I think we figured on a basis of just about 50 x 50.

Q. $10,000 for the equipment and $10,000 for the lease?

A. $10,000 for the equipment and $10,000 for the lease." . . .

"Q. In making your—in paying them the price of $20,000. did

you include in your judgment anything for good will as an operating restaurant?

A. No."

On cross examination Oliver testified:

"Q. What was the situation in 1947, June of 1947, was it still difficult to obtain restaurant equipment?

A. Yes, it was, on a lot of that material.

Q. However, you would say that—

A. (Interrupting): I would like to say it this way: If we had to buy all that material now to equip the restaurant, it would have cost us $20,000. anyway.

Q. To buy all new equipment?

A. To buy all new equipment. That is about the best way I can answer that.

Q. That would be to buy it new?

A. Yes.

Q. Now, you would agree, I assume, that a going business, whether it was a restaurant or anything else, has a value in addition to the physical assets that might be connected with it?

A. Yes, in general that would be true.

Q. And in paying the $20,000. for this property you were taking into consideration the fact that it was a going business, that it was a desirable site for a restaurant business, and all the circumstances in connection with it as a business location and business enterprise, would you not?

A. Yes.

Q. When did you start negotiating for the purchase of the cafe?

A. Oh, I think it was about the 15th of June.

Q. And with whom did you deal?

A. Dealt through Harold Boe.

Q. With whom did you deal so far as the ownership was concerned?

A. Mr. Larson; Mr. and Mrs. Larson.

Q. And did they say anything to you at that time with reference to the condition of the business as to whether it was a money maker, or otherwise?

A. They told us it had been losing money rather heavily for the last three or four months.

Q. Did they say anything about what the condition had been prior to that?

A. They said it had been making money before that.

Q. I assume they blamed the loss of money during the last two or three months on the manager of the enterprise?

A. That would be my assumption." . . .

"Q. When did you take possession of the restaurant?

A. It was June 19th or 20th.

Q. That you took possession?

A. Yes.

Q. But you actually completed the sale about the 23rd?

A. No, we opened for business on the 23rd."

It is undisputed that the sale by the Larsons to the Olivers was made through one Boe a real estate broker at Grand Forks. On his direct examination Larson testified:

"Q. You had the restaurant in the hands of a real estate agent, did you?

A. No, I did not. I did not give it to any real estate dealers. I merely mentioned at the Country Club to one of the real estate agents that I didn't know what to do with the cafe; it was losing money and we would like to find somebody to come in and lease it or buy it.

Q. And that was Harold Boe.

A. Yes, sir."

He further testified that a few days later Harold Boe approached him about the Olivers, that the first time he talked with Oliver about the matter was on June 20th, that the sale was completed on June 23rd. Mrs. Larson testified that she never dealt with the Olivers, that Mr. Larson did. During the cross examination of Betty Larson defendants' counsel said:

"It is a fact—we will stipulate on the record she did sell; she and Mr. Larson have sold the restaurant and equipment to the Olivers for $20,000., including the lease for five years with an

option to renew it. . . . It is stipulated that the proceeds of the sale were mingled with other funds of Mr. and Mrs. Larson."

Mrs. Larson testified that they had not accounted to the Engstroms for any part of the $20,000.

The defendants offered and there was received in evidence a bill of sale executed by C. R. Larson and Betty Larson reciting that "in consideration of the sum of One dollar and other valuable considerations to them in hand paid by A. Russell Oliver and Catherine D. Oliver, of Grand Forks, in the County of Grand Forks and the State of North Dakota the receipt whereof is hereby acknowledged," C. R. Larson and Betty Larson "have Bargained and Sold, and by these presents do BARGAIN, SELL AND DELIVER unto the said A. Russell Oliver and Catherine D. Oliver, their heirs and assigns, Forever, the following described goods, chattels and personal property, to-wit:

"All restaurant and kitchen furniture, fixtures and equipment now located and used in and about the Columbia Cafe, in Grand Forks, North Dakota, including all dishes, cooking utensils, tools, counters, shelves, show-cases, stools, cash-registers, stoves, refrigerators, freezing equipment, dish-washing machine, water heater, steam-tables and each and every other thing used in and about the operation of said cafe."

The bill of sale does not show the specific date on which the instrument was executed. It states that it was executed "on this ....day of June, 1947."

There was also introduced in evidence by the defendants a lease executed by C. R. Larson and Betty Larson as parties of the first part and A. Russell Oliver and Catherine D. Oliver as parties of the second part. The lease recites that it was made this 21st day of June 1947 and the concluding line of the lease states that "The parties have here-unto set their hands and seals this ....day of June, 1947." The lease describes the premises leased by the Larsons to the Olivers as "All that portion of the Columbia Hotel, located at 624 DeMers Ave., in the City of Grand Forks, North Dakota, used and occupied by the Columbia Cafe, in the southwest portion of the first floor of said Hotel, together with the right to the use of adequate storage space for such cafe business in the basement of said Hotel, and

the right to the use of adequate toilets and washrooms in the said hotel by employees and patrons of said cafe." The lease provides that "the term of this lease shall be five years, commencing on the 1st day of July, 1947, and expiring on the 30th day of June, 1952" and that it is renewable for an additional five years at the end of the prescribed period. The lease provides that the rent for the premises shall be $150 per month payable in advance for the first year of the term and that the rent for the remaining four years of the term shall be computed on the basis of a percentage of gross sales stated in the lease. It provides that the Olivers shall have the option of subleasing the premises or of assigning the lease to any third party who shall meet the approval of the parties of the first part and that all the provisions of the lease shall apply to such sublessees or assignees of the lease. The lease further provides:

"The above rented premises are to be occupied and used by the second parties for the operation of a restaurant, together with such related activities as news and magazine stand, soda fountain, confectionery and cigar stand, as second parties may desire to carry on, and for no other purpose."

So far as the evidence shows the above mentioned bill of sale from the Larsons to the Olivers and the lease between the Larsons and the Olivers were the only instruments executed by the parties incident to their transaction. The personal property that was sold and delivered by the Larsons to the Olivers and described generally in the bill of sale included in addition to the property and equipment in the cafe owned by the partnership certain other personal property belonging to the Larsons. It included certain personal property originally purchased by C. P. Stone and D. F. (B) McGowan for the hotel proper in 1938, and certain personal property purchased by the Larsons from Robert D. McGowan about April 1, 1947. The property originally purchased by Stone and McGowan was purchased by them in 1938 under a conditional sales contract for a consideration of $3589.10, payable in monthly installments. The property purchased by the Larsons from Robert D. McGowan on April 1, 1947, was purchased by the Larsons from McGowan with the bar or beer parlor which had been and was being operated in

the Columbia Hotel by McGowan. According to the testimony of C. R. Larson he purchased from Robert D. McGowan the bar which McGowan was operating in .the Columbia Hotel including the good will of the business and certain equipment. .The purchase was made on or about April 1, 1947, and a bill of sale, dated that day, was executed and delivered by McGowan, transferring to C. R. Larson and Betty Larson certain personal property described in the bill of sale, consisting of certain equipment then in the Columbia Cigar Store and Bar that had been and was being operated by McGowan and the good will of such business. The bill of sale recites a payment by the Larsons of a consideration of $8000. Larson testified that he paid McGowan $8000 the consideration stated in the bill of sale, and that the purchase price which he paid was divided as follows: $4000 for equipment and $4000 for good will. On his cross examination he testified:

"Q. And this division of $4000. for good will and $4000. for equipment, is that a division that you made mentally, or was it a division that you and Mr. McGowan agreed upon at the time of the sale?

A. No, that was an agreement—a division that was made after consultation with my Auditor and my Attorney, and an income tax collector.

Q. I see. In other words, you and Mr. McGowan at the time of the sale, did not sit down and figure out that the merchandise and fixtures totaled about $4000., and the good will ought to be worth $4000. You made a lump sum purchase there just the same as you made a lump sum sale of the cafe to the Olivers?

A. Made a lump sum purchase from McGowan."

The bill of sale from McGowan to C. R. Larson and Betty Larson enumerated, among others, the following articles: 3 booths, 12 stools, one glass cigar show case, and one walnut and glass wall case. On cross examination Larson testified as follows with respect to these articles:

"Q. Now, included in this Bill of Sale are three booths. Did you move those booths over to the cafe?

A. No, sir.

Q. They are still in the bar or cigar store?

A. No, they are down in the basement. They are worn out booths.

Q. And 12 stools. What became of them?

A. They are in the basement. They are worn out."

When asked if he knew what the glass cigar show case was worth he answered, "My opinion is it was worth about $1200." When asked if he had any idea as to what the walnut and glass wall case was worth he answered, "Approximately $1000." Later defendants' counsel stated:

"It is stipulated that if A. Russell Oliver were recalled as a witness he would testify that in his judgment as of the date of the purchase of the Columbia Cafe by him, that the value of the large glass wall case would be about a couple of hundred dollars; that he would doubt if you could replace the showcase, the cigar showcase, for less than $200."

Plaintiffs' counsel stated that what had been said by defendants' counsel was correct.

The plaintiff George E. Engstrom testified that the cigar showcase and the walnut and glass wall case were not new, that he should judge they would date back anywhere from 30 to 40 years; that they are obsolete but are still used in some places; that he took in a showcase at Carrington very similar to the cigar showcase, and that the cost was estimated in the inventory at $50.00.

The testimony shows that the deal between the Olivers and the Larsons was made through the broker Boe, that the Olivers paid $20,000 to such broker, that the broker retained $2000 for commission for making the sale and paid $18,000 to the Larsons. The defendants contended and the trial court found that the $18,000 received by the defendants should be apportioned as follows: $9000 to the defendants for the lease given to the Olivers and $9000 for the equipment and personal property transferred to the Olivers and covered by the bill of sale given to them by the Larsons. In fixing the amount to be distributed and allotted to the plaintiffs and defendants an auditor employed by defendants, who was one of the principal witnesses for the defendants, adopted as a basis for distribution of the proceeds

of the sale of the personal properties the cost of acquisition of the properties by the respective parties and this same plan was adopted by the trial court. The court found that there should be apportioned and allowed to the partnership the sum of $2344.12; $1200 being the price paid to Argeros for the property transferred by him to Stone and Engstrom in 1944; $561.93 for an electric dishwasher purchased by the partnership in 1947; $213.25 for dishes purchased in 1947; and $348.94 for repairs on the stove. The court further found that there should be allotted and paid to the Larsons the sum of $3589.10 for the fixtures and equipment purchased by Stone and McGowan in 1938 for which they then paid $3589.10 and that there should be allotted and paid to the Larsons $4000 for the equipment purchased by the Larsons from McGowan on or about April 1, 1947. As said, the apportionment was made on the basis of the cost of acquisition of such properties and there was no testimony tending to show what the property purchased from Argeros in 1944 was worth at the time it was acquired, although Engstrom testified that at the time the property was purchased the partnership "got a good bargain." Engstrom testified that some of the property acquired from Argeros especially the heavy galvanized aluminum pots had increased in value very substantially and that articles which had been bought in addition to or as replacement of dishes and silverware had increased in cost, that silverware had practically trebled. The evidence as to the value of the equipment purchased by Stone and McGowan related almost solely to the price paid by Stone and McGowan at the time the property was acquired by them in 1938. However, testimony was offered as to the comparative value of the personal property sold to the Olivers which had belonged to the partnership and the property that was sold and delivered to the Olivers which belonged to the Larsons and in which the partnership had no interest. Oliver testified that the property belonging to the Larsons constituted the major value of the equipment which the Olivers received. A list or inventory of the properties purchased by Stone and McGowan in 1938 was introduced in evidence as defendants' exhibit 5 and when asked if the properties which the Olivers purchased and received from

the Larsons outside of that described in such exhibit 5 would be worth as much as the property described in such exhibit Oliver answered:

"Well, I doubt if it would be valued up to as much as on Exhibit 5. I doubt if we would value it up to an equal value as on Exhibit 5.

Q. Would you value the stuff on Exhibit 5 as being in excess of $5000?

A. Yes, I think if I had to place any hard fast value on it I would put the material on Exhibit 5 a little higher than that in proportion to the other on the basis of what we were paying."

The plaintiff George E. Engstrom testified that the personal property which belonged to the partnership and was sold by the Larsons to the Olivers and the personal property which belonged to the Larsons and was sold to the Olivers were about equal in value.

At the time Claude P. Stone and George E. Engstrom formed a partnership in October 1944 to purchase the Columbia Cafe from Argeros and to operate the same, the Columbia Hotel building in which the cafe was located was owned by Stone and one McGowan. Stone and Engstrom rented the quarters in which the Columbia Cafe was operated for $100 a month and at the same time McGowan and his son had rented and were occupying a portion of the hotel in which they were operating a bar or beer parlor for a like rent. There is evidence to the effect that in the fall of 1945 Stone and McGowan determined to have executed leases in writing for longer terms to cover the rental of the quarters then occupied respectively by the cafe and by the bar or beer parlor. There is also evidence to the effect that written leases were executed and there is no dispute in the testimony concerning the lease executed to McGowan. Under this lease the part of the hotel occupied by the bar then operated by McGowan was rented to McGowan and his son for a period of five years with the privilege of renewing the same for an additional five year period at a monthly rental of $100 per month. The plaintiff, George E. Engstrom, testified that at the time these leases were to be executed Stone discussed the matter with him and that it was understood between them that a written lease

was to be executed renting the cafe premises to the partnership on substantially the same terms as the lease which was executed to McGowan. He further testified he signed such lease; that no duplicate or copy of the lease was made and that the lease was sent to Fargo. The plaintiffs contended that the partnership had a written lease for the premises occupied by the Columbia Cafe and that the same constituted an asset of the partnership. Mrs. Larson denied that any such arrangement was made. Thereafter there was introduced in evidence by defendants a written lease to Claude P. Stone and Betty Stone for the part of the building known as the Columbia Cafe. Such lease was for a term of five years commencing October 1, 1945, and expiring October 1, 1950, with a privilege to renew said lease for a five year period all at the rental of $100 per month.

The lease describes the premises rented as:

"The Front Sixty-five (65) feet of the ground floor of that three story brick building located at #624 DeMers Avenue in Grand Forks, North Dakota, known as the Columbia Cafe, and the equipment, furnishings and fixtures therein." It provides that "The above rented premises are to be occupied and used by the second parties for restaurant and for no other purpose." It further provides that the second parties (lessees) covenant with the first parties (lessors) "not to sublet the premises herein described, or any part thereof and not to assign this lease, in full or in part in any manner whatsoever, and not to use or occupy the premises above described, or any part thereof, for any other purposes than that hereinbefore mentioned."

Mrs. Larson testified that the lease to Stone and Mrs. Stone for the space occupied and known as the Columbia Cafe and the lease to McGowan for the space occupied by him as a bar were taken "for Mr. McGowan and Mr. Stone's protection in case they wanted to sell the building so there would be no lease to someone else, so they could sell the lease and hotel themselves." · That the lease "was for the purpose in case they did sell the hotel they could sell it together and no one else would have a lease."

George E. Engstrom testified that he never knew that any such lease was in existence as the one that was introduced in evidence,

leasing to Claude P. Stone and Betty Stone the part of the building known as the Columbia Cafe, until such lease was offered in evidence upon the trial of the action. Mrs. Larson testified that she did not tell either of the Engstroms about the lease being taken in the name of Mr. Stone and herself. She said, "I didn't tell them anything. I had no reason to tell them anything about it." She did say that Engstrom "knew he didn't have a lease. That is why he walked out." This latter statement is a mere assertion. Engstrom denied he had any such knowledge and there is no proof to show that he had. In September 1945 when a written lease is said to have been made the partnership was operating the Columbia Cafe and had been operating the same and paid rent therefor since October 1944. The partnership continued to operate the business after September 1945 and to pay rent as before and they were occupying the premises at the time the defendants commenced their negotiations for the sale to the Olivers in June 1947. The testimony shows without dispute that the defendant, C. R. Larson utilized one of the checks which Mrs. Engstrom signed in blank and delivered to him at Valley City on June 14, 1947 and filled in the date of June 16 and made the check payable to the Columbia Hotel for a sum which, as the trial court found, was in excess of the amount due for rent including the rent for the month of June 1945. The check was paid.

It does not seem unlikely that at the time the arrangements were being made between Stone and McGowan for the execution of written leases for the premises that had been occupied respectively by the Columbia Cafe and by the bar operated by McGowan, that there was some discussion between Stone and Engstrom concerning a lease of the premises occupied by the cafe as apparently the relations between Stone and Engstrom had been and were harmonious and satisfactory, and there is nothing to indicate there was any intention or thought on the part of Stone to alter or discontinue such relations or the business that was then carried on by them. The evidence, however, does not establish that the partnership received a written lease but that it continued to occupy the premises under the oral lease, which had not been terminated and was in force when the cafe

business was sold by the defendants to the Olivers in June 1947.

Plaintiffs contend that the good will of the partnership business was an asset of the partnership and should be so considered in this action. The laws of this state provide:

"The goodwill of a business is property transferable in the same manner as any other." NDRC 1943, 47-0711.

The good will of a partnership business is a part of the firm assets. 40 Am Jur, Partnership, Sec 109, p 203 et seq, Sec 307, p 343, Sec 351, p 375 et seq; 28 CJ Sec 5, p 735; 2 Rowley, Modern Laws of Partnership, Sec 660, p 894; McFadden v. Jenkins, 40 ND 422, 169 NW 151; Kelly and McLaughlin v. Pierce and Champine, 16 ND 234, 112 NW 995.

The defendants do not deny that good will of a partnership business is an asset of the partnership but they contend that the cafe business operated by the partners had no good will. They say that the Columbia Cafe in the period between January 1, 1947, and the time of the sale to the Olivers had been operated at a loss and that there was no good will. The defendants submitted an operating statement prepared by their auditor showing a net loss by the cafe subsequent to January 1, 1947, of $1225.28. However, evidence does show that during this period substantial sums were expended for capital goods, so actually the net loss was considerably less than that stated by the auditor. The evidence shows and the trial court found "that at the time Stone and Engstrom purchased the cafe equipment and took over the operations of the cafe, the same had been run down and the previous owner had very little business, and that in 1945 the net income of the partnership was $3,239.31, and for 1946 it was $4,524.31." The trial court also found:

"that during 1947 the cafe business did not show an operating profit; that it became necessary to expend considerable money in making repairs and purchasing additional equipment; that a new dishwasher was purchased for $528.23, approximately $400.00 was expended for repairs on the stove, and approximately $200.00 for new dishes."

In a memorandum decision the trial court expressed the view that inasmuch as the partnership had shown no profit, but had

operated at a loss, during the period subsequent to January 1, 1947, there was no good will and furthermore that there was no testimony as to the value of good will "if there was a good will." The trial court was correct in holding that the value of good will had not been proven but we are agreed that the trial court was in error in holding that the facts and circumstances in this case established that no good will existed.

The cafe had little business when it was taken over in 1944 by the partnership then consisting of Claude P. Stone and George E. Engstrom. In 1945 it had a net income of $3,239.31 and in 1946 it had a net income of $4,524.31 and it was only during the period subsequent to January 1, 1947, that it did not operate at a profit and sustained some loss. The fact that it did not make a profit during this short period and sustained an operating loss did not establish that there was no good will. 38 CJS Sec 2, p 950; McFadden v. Jenkins, 40 ND 422, 169 NW 151; Rockwood Pottery Co. v. Commissioner of Internal Revenue, CCA, 45 F2d 43; Commissioner of Corporations and Taxation v. Ford Motor Co., 308 Mass 358, 33 NE2d 318, 139 ALR 936. The fact that the cafe had operated at a loss during 1947 did not of itself establish absence of good will. In McFadden v. Jenkins, supra, this court said:

"We are of the opinion that neither the fact that the business is very profitable or successful, nor that it is not a very profitable and even a losing business, is the only test of good will. A business may not be profitable, and may even be a losing business, and still be possessed of a good will. . . . nor does it follow that a business which pays poorly or which is operated at a loss is not possessed of a good will, in view of the fact that good will may be said to be a desire of old clients to resort or return and continue business relations where the clients have been accustomed to do business." 40 ND at pp 444–445.

It is said that Oliver testified, "that in his judgment the old cafe had no good will whatever." We do not so construe his testimony. The only testimony of Oliver relating specifically to good will was the following question and answer on his direct examination:

"Q. In making your—in paying them the price of $20,000. did you include in your judgment anything for good will as an operating restaurant?

A. No."

On his cross examination he testified:

"Q. Now you would agree, I assume, that a going business, whether it was a restaurant or anything else, has a value in addition to the physical assets that might be connected with it?

A. Yes, in general that would be true.

Q. And in paying the $20,000. for this property you were taking into consideration the fact that it was a going business, that it was a desirable site for a restaurant business, and all the circumstances in connection with it as a business location and business enterprise would you not?

A. Yes."

Our statutes define good will as follows:

"The goodwill of a business is the expectation of continued public patronage, but it does not include a right to use the name of any person from whom it was acquired." NDRC 1943, 47-0710.

The Olivers purchased the cafe with all physical properties belonging to the partnership utilized in the operation of the cafe. The bill of sale which the Larsons executed and delivered to the Olivers specifically covered all restaurant and kitchen furniture, fixtures and equipment located and used in and about the Columbia Cafe "including all dishes, cooking utensils, tools, counters, shelves, show-cases, stools, cash-registers, stoves, refrigerators, freezing equipment, dish-washing machine, water heater, steam-tables *and each and every other thing used in and about the operation of said cafe.*" The Olivers took over and received from the Larsons all the equipment and appliances with which the business was and had been carried on and even the food supplies on hand. At the same time they obtained a lease for the premises so that it was understood between the parties that the business would continue to be carried on in the same location

562

where it had been carried on. Hence, it is quite likely that nothing was said about good will and that Oliver did not make any appraisal thereof as a separate item, for he would naturally assume that the good will passed as an incident of the business.

"The sale of a business will be presumed, in the absence of any expression to the contrary in the agreement of sale, to pass the good will of the business with other assets." 40 Am Jur, Partnership, Sec 200, p 270. 38 CJS, Sec 8, p 955; 24 Am Jur, Good will, Sec 13, p 810. Note: 18 Ann Cas p 433.

We are unable to agree with the trial court as to the basis to be employed in allocating the monies which the Larsons received for the sale to the Olivers. We see no valid reason for adopting the cost of acquisition as the basis for payment to the owners of the property sold without regard to the then value of the properties. This is not a case of distribution of proceeds from the sale of partnership property alone. It is a case involving the distribution of the proceeds of a sale en masse made by a partner without the consent of the other partners of the whole of the partnership property together with individual property of the partner who made the sale and where the proceeds of the sale were commingled by the partner who made the sale with the partner's own funds.

"The relationship of partners is fiduciary and imposes upon them the obligation of the utmost good faith and integrity in their dealings with one another with respect to partnership affairs." 40 Am Jur, Partnership, Sec 128, p 217.

See, also, 47 CJ pp 771–772; Lay v. Emery, 8 ND 515, 79 NW 1053; Olivier v. Uleberg, 74 ND 453, 23 NW2d 39, 165 ALR 974.

"The relations of partners are confidential. They are trustees for each other within the meaning of the provisions of the title Trusts, Uses, and Powers. Their obligations as such trustees are defined by that title." NDRC 1943, 45–0109.

A general partner is the agent of the partnership in the transaction of its business and has authority to do whatever is necessary to carry on such business in the ordinary manner. NDRC 1943, 45–0203. But "a general partner as such has not authority

to do any of the following acts, unless his copartners have wholly abandoned the business to him or are incapable of acting: . . . 2. To dispose of the goodwill of the business; 3. To dispose of the whole of the partnership property at once, unless it consists entirely of merchandise; 4. To do any act which would make it impossible to carry on the ordinary business of the partnership; . . . ." NDRC 1943, 45-0204.

The defendants mingled the whole of the partnership property with certain properties of their own and sold all the properties in one lot and for one consideration for all. They made such sale without consulting the copartners or even notifying the copartners of the proposed sale although the copartners were within easy communication. (1 Rowley, Partnership, Sec 402, p 480, Sec 444, pp 545-546) The defendants represented that the properties which they thus sold in one lot all belonged to them and they gave a bill of sale to the Olivers wherein they agreed to warrant and defend the title of all of said property unto the Olivers, their heirs and assigns against all lawful claims. The defendants mingled the monies which they received from the Olivers with their own funds and made no account at all to the copartners. The defendants were charged with the obligations and duties of a trustee. NDRC 1943, 45-0109. The trustee is under a duty to the beneficiary to keep the trust property separate from his individual property. Restatement of the Law, Trusts, Sec 179, p 456.

"It is a cardinal duty of all trustees to keep the fiduciary property separate and distinct; and law and equity alike hold them strictly to its observance." 2 Schouler's Personal Property, 2d ed, Sec 48, pp 46-47.

"Equity impresses a trust, lien, or charge on the mass for the restitution of the trust property or funds commingled therein until the trust property or fund is separated from the mass, and, where such separation is not possible, until adequate restitution, in some form authorized by law, is made."

"In endeavoring to ascertain how much trust property or money went into the commingled mass, and how much was the trustee's own, every reasonable intendment should be made against

564

the trustee through whose fault the truth in the matter has become obscure. Indeed, the rule has been followed that where the commingling is through the fault of the trustee, the entire mass will be treated as trust property or funds except in so far as the trustee may be able to distinguish what is his." 54 Am Jur, Trusts, Sec 256, p 199.

All the inconveniences resulting from the action of the trustee in commingling property or funds of his own with the property or funds which he held in trust are thrown on the trustee, through whose fault the resultant confusion has arisen, and he has the burden to establish his rights and to prove by clear and convincing evidence what part of the mass or fund belongs to him. 11 Am Jur, p 537, Sec 13; 6 A & E Ency of Law, 2d ed, p 596; 2 Beach on Trusts and Trustees, p 1172, Sec 516.

Under the evidence in this case we are unable to make any distribution of the funds which the defendants received from the Olivers. The defendants claim that in the sale to the Olivers there was included with the partnership property three items belonging to the Larsons individually, namely, (1) the personal property originally purchased by Stone and McGowan in 1938; (2) the property purchased by the Larsons from McGowan about April 1, 1947; and (3) the lease between the Larsons and the Olivers.

As has been pointed out distribution was made by the trial court on the basis of the cost of acquisition of the personal properties, and the evidence on which the court acted related principally to cost of acquisition. As to some of the property belonging to the Larsons individually the evidence as to cost of acquisition is vague and uncertain and does not show that the cost of acquisition or the value at the time of acquisition was as much as that fixed by the trial court.

Thus with respect to the property that was acquired by the Larsons from McGowan about April 1, 1947, Larson testified that this was acquired as a part of the transaction when he purchased the bar or beer parlor from McGowan; that in such purchase he paid McGowan $8000 for the bar and cigar store including the good will of the business and certain equipment and personal

property which are described in the bill of sale which the Larsons then received from McGowan. Larson testified that he made a division of the property received from McGowan so as to allow $4000 for good will of the business and $4000 for the personal property. He further testified that he "made a lump sum purchase from McGowan," and that a division was made in the purchase price as between good will and equipment "after consultation with my Auditor and my Attorney and an income tax collector." Two of the principal items of personal property which the Larsons purchased and received from McGowan in such sale were a cigar show case and a wall case. On being asked as to the value of these two articles Larson testified that in his opinion the cigar show case was worth $1200 and that the wall case was worth approximately $1000. It was later stipulated, in a stipulation dictated into the record by defendants' counsel, that if Oliver were called as a witness he would testify that one of these cases was worth $200 and that he would doubt if the other one could be purchased for less than $200.00. Engstrom testified to a much lesser value. This testimony does not show that personal property which Larson purchased and received from McGowan had a value of $4000. It shows that it was worth considerably less.

The evidence relating to the value of the personal property of the Larsons which originally had been acquired by Stone and McGowan in 1938 is restricted to the evidence as to the cost of acquisition in the purchase made in 1938.

The trial court allotted to the Larsons for the lease one-half of the $20,000 which the Olivers paid to the Larsons in the transaction between them. We are not at all clear from the evidence what it was that it is claimed the Larsons sold to the Olivers as a lease as a part of the transactions where the $20,000 were paid. The court in its memorandum decision said that the Olivers "paid $20,000 for the cafe equipment and for the assignment of the written lease. Exhibit 8," (the lease to Claude P. Stone and Betty Stone executed in September 1945). And that Oliver stated that "he paid $10,000., or one-half of the purchase price, for the equipment, and $10,000. for the assignment of the written lease." We find no evidence to sustain this statement. No assignment of

a lease was introduced in evidence, and there was no evidence that one had been made.

The only testimony having any relation to the value of a lease is the testimony of Oliver which we have quoted above and which reads as follows:

"Q. In the purchase of the property in paying $20,000. for it, did you segregate, insofar as your deal with the Larsons was concerned, did you segregate the amount that you paid for the various items within the term equipment and fixtures, or did you just make one total payment of $20,000?

A. Just made one total payment of $20,000."

"Q. In arriving at the figure of $20,000., will you tell the Court what value you placed upon the equipment which was in the cafe, and what value you placed upon *the right to secure the lease of the premises?*

A. Well, insofar as we tried to break it down at all I think we figured on a basis of just about 50 x 50.

Q. $10,000 for the equipment and $10,000 for the lease?

A. $10,000 for the equipment and $10,000 for the lease." (Italics supplied)

In the statement prepared by the auditor the apportionment for the lease is made as follows:

"*Apportionment of selling price of cafe:*
50% of Selling Price apportioned to lease value held and controlled by Columbia Hotel, Grand Forks, North Dakota, a partnership between C. R. and Betty Stone Larson as Joint Tenants $10,000.00
50% of Selling Price apportioned to sale of equipment 10,000.00

$20,000.00"

In defendants' brief on appeal reference is made to the item of the lease as follows: "The total consideration paid by the

Olivers was the sum of $20,000.00. Mr. Oliver testified that he based the $20,000.00 figure on a value of $10,000.00 for the equipment and $10,000.00 for *the opportunity to lease the premises* although there was no segregation of these items in the deal with the Larsons. The lease is in evidence as Exhibit 7 (the lease between the Larsons and the Olivers made June 21, 1947), and the Bill of Sale to the Olivers as Exhibit N." Elsewhere in defendants' brief reference is made to. "the $10,000 which the Olivers paid for *the privilege of getting a lease*," and it will be noted that in the testimony of Oliver above quoted defendants' counsel in a question propounded to Oliver referred to *"the right to secure the lease."*

The lease which was executed by C. R. Larson and Betty Larson as parties of the first part and A. Russell Oliver and Catherine D. Oliver as parties of the second part in June 1947 is complete on its face and contains specific provisions as to the rent to be paid by the Olivers to the Larsons for the leasehold granted by the lease. We do not understand from Oliver's testimony that he made any bargain with the Larsons to pay them for the leasehold a consideration in addition to that stipulated in the lease. Oliver's testimony seems to indicate rather that the division of the $20,000 which he paid was his own mental inventory of what he thought he had received in the transaction.

In any event, as the evidence stands, we are unable to make any determination as to what distribution, if any, should be made to the Larsons for what the trial court in its memorandum decision denominated "the assignment of the written lease;" the auditor in his statement of apportionment denominated "lease value held and controlled by Columbia Hotel, Grand Forks, North Dakota, a partnership between C. R. and Betty Stone Larson as Joint Tenants;" and defendants' counsel in his question to Oliver denominated "the right to secure the lease of the premises;" and in the brief on appeal denominated "the opportunity to get a lease" and "the privilege of obtaining a lease."

The Olivers received from the Larsons the Columbia Cafe as it then stood including all tangible and intangible property belonging to the partnership. When Larson contacted the broker Boe, according to his testimony he then stated to Boe that "I

didn't know what to do with the cafe; it was losing money and we would like to find somebody to come in and lease it or buy it." When Oliver on or about June 15th commenced to negotiate with Boe for the purchase of the cafe the business was in operation. It continued to operate until the close of business on June 19th and according to Oliver's testimony he took possession on June 19th or 20th and opened the cafe for the regular transaction of business on Monday, June 23rd.

In the lease between the Larsons and the Olivers, the premises let were described as "all that portion of the Columbia Hotel, located at 624 DeMers Ave., in the City of Grand Forks, North Dakota, used and occupied by the Columbia Cafe," and the lease specifically provided that the "rented premises are to be occupied and used by the second parties for the operation of a restaurant, together with such related activities as news and magazine stand, soda fountain, confectionery and cigar stand, as second parties may desire to carry on, and for no other purpose." In the stipulation dictated into the record by defendants' counsel it was stated that the Larsons "sold the restaurant and the equipment to the Olivers for $20,000 including the lease for five years with an option to renew it." In the transfer to the Olivers of the partnership properties the Olivers acquired not only the physical properties of the partnership but also the intangible properties or values incident thereto which the cafe had as a going concern including whatever good will the business had. According to Oliver's testimony there was no separation or segregation of the separate items that were included in the transfer or the amount to be paid for any one of them. There was an agreement between the parties whereby the Larsons agreed to sell and the Olivers agreed to buy all of the properties in one lot for one consideration of $20,000. The Larsons executed and delivered to the Olivers a written bill of sale wherein they specifically represented themselves as owners of all of the properties and agreed to warrant and defend the title thereto. The property so sold and which the Olivers received was the whole of the partnership property and included such intangible property as was incident to the tangible properties. The defendants not only sold all the partnership property as their own and without consultation with

the copartners, they received the consideration and treated it as their own. They mingled the monies they received from the Olivers with their own funds and made no accounting to their copartners. In the circumstances established in this case equity will impress a charge on the entire fund in behalf of the partnership until the trust fund, that is, the fund belonging to the partnership, is separated from the rest. It is incumbent upon the defendants to establish what portion of the $18,000 which they received and now hold belongs to them and should be apportioned to them for the individual properties of the defendants which they mingled with the properties of the partnership and sold as one lot to the Olivers and the balance of the fund will be distributed to the partnership as proceeds of the partnership assets which the defendants without authority sold and delivered to the Olivers.

The judgment appealed from will be set aside and the case remanded for further proceedings conformable to this opinion. It is so ordered.

NUESSLE, C. J., MORRIS and BURKE, JJ., concur. GRIMSON, J. did not participate, WM. H. HUTCHINSON, Judge of Third Judicial District, sitting.

HUTCHINSON, Dist. J. I dissent from the order remanding the case for a new trial in the district court. Both parties have demanded a new trial in this court.

Although the evidence as to values is not altogether satisfactory, when all is considered, together with the admissions of counsel, I believe that this court could enter a fair and equitable judgment. More than three years have now elapsed since the defendant sold the partnership property and the plaintiffs have received nothing. Because of the very nature of the case it is doubtful if the evidence upon another trial will be much more satisfactory. The plaintiffs should not be subjected to the delay of another trial with the possibility of another appeal. I have no disagreement with the principles of law discussed in the majority opinion.

As this case must be retried, it would not be proper for me

570

to analyze the evidence in the record and outline the decision which I would render.