CHAMBERS, ADMINISTRATOR, *v.* WILLIAMS, ADMINISTRATOR.

4-5618 132 S. W. 2d 654

Opinion delivered October 30, 1939.

*Hill, Fitzhugh & Brizzolara,* for appellant.

*Paul X. Williams,* for appellee.

GRIFFIN SMITH, C. J. M. A. Williams wrote his will in 1887. It has been construed twice by this court and is here a third time.

That part of the will necessary to a consideration of the instant case is:

"I bequeath all my lands, tenements and hereditaments and all household furniture, ready money, securities for money, goods, chattels and all other parts of my real and personal estate and effects whatsoever unto my wife, Georgianne R. Williams, and the heirs of her body to and for their absolute use and benefit for her lifetime subject only to the payment of my just debts.

funeral and testamentary expenses and the charge of proving and recording this, my will.''

In 1908—twenty-one years after execution of the will—M. A. Williams died. No children had been born to his union with Georgianne. The wife died in 1937, without issue. Elsewhere in this opinion she will be referred to as Mrs. Williams.

In 1924 Mrs. Williams, through the Sebastian Chancery Court, undertook to have her title confirmed in certain lots located in the city of Fort Smith, such lots having been owned by M. A. Williams at the time of his death. The complaint alleged that Mrs. Williams had title to the lots under the will of her husband; that in an *ex parte* proceeding had in 1908 it was decreed that she took a present absolute estate.

The demurrer of the heirs of M. A. Williams was sustained.

In *Williams* v. *Williams,* 167 Ark. 348, 268 S. W. 364, this court said: ''The devise is to 'my wife, Georgianne R. Williams, and the heirs of her body.' If this was all the will said, it is clear, under [*Watson* v. *Wolff-Goldman Realty Co.,* 95 Ark. 18, 128 S. W. 518, Ann. Cas. 1912A, 540] and numerous other cases cited in the briefs, that the wife would have taken only an estate for life, with remainder over to the heirs of her body, or her children, but, as no children were born to her, this life estate would expire, failing children, upon her death, and the remainder would pass in fee simple absolute to the heirs-at-law of the testator. The will, however, does not end with the words quoted, but these are followed by the words 'to and for their absolute use and benefit for her lifetime.' Do these last words enlarge the estate devised to the wife to a fee simple, subject to be opened up to let in children born to her who would share this fee simple title with her? The decision of this question is determinative of the testator's intention, and we do not answer it with the assurance of inerrancy. We have concluded that only an estate for life was granted to the wife, and even this estate was to be shared by her children during her lifetime, if any were born.''

In 1937-'38 interested parties were again in court, this time seeking a construction of the will with respect to personal property. See *Williams* v. *Chambers,* 195 Ark. 654, 113 S. W. 2d 722. After reviewing the holding in the *Williams* v. *Williams* Case, the opinion states: "It is true that real estate only was involved in the [former] case, but that does not in any way change the rule applicable to the personal property. . . . There is nothing in [the language of the will] to indicate that the testator intended to devise and bequeath a different estate in the real estate and personal property. The same intent on his part governed the disposition of both the real estate and personal property."

This decision, therefore, is authority for the proposition that a life estate only was bequeathed in the personal property. At the death of the life tenant the remainder descended to the heirs of M. A. Williams. The question is, What were Mrs. Williams' rights during the life period?

The will executed by Mrs. Williams left to devisees and legatees all of the property to which she had title at the time of her death.

Upon remand of the Williams-Chambers Case (February 21, 1938), the chancellor appointed a master who stated an account of the personal property. The report showed that Mrs. Williams received $20,388.13 through her husband, and $14,315 from independent sources. Residue of both estates was $8,601.25. No exceptions were filed to the master's report.

On behalf of those who stood to benefit through Mrs. Williams' will it is contended that she exhausted the whole of her husband's personal estate, and that the item of $8,601.25 is her separate estate.

Consonant with this court, the chancellor held that Mrs. Williams had but a life estate in the personal property which constituted the item of $20,388.13 identified in the master's report. Judgments were given in favor of the remaindermen, as their interests appeared, for amounts aggregating $20,388.13. A lien was declared to secure the judgments. This appeal is from action of the chancellor in refusing to hold that the residue of

Mrs. Williams' estate and that of her husband's estate represented holdings other than values arising through M. A. Williams.

Mrs. Williams did not keep separate accounts. Her own funds were mingled with moneys received from her husband. . There was no thought, apparently, that an accounting would be required. Certainly no imputation of intentional bad faith is shown or suggested. On the contrary it is quite obvious that Mrs. Williams honestly believed the personal estate was hers to do with as she thought proper. However, this fact itself renders segregation impossible. No one can say, with any degree of conviction, that all or any appreciable part of the balance unexpended in 1937 was residuary in respect of the estate of M. A. Williams, or that it was, or was not, a personal acquisition. The nature of the transactions and the very fact of good faith make accounting impossible.

The weight of decisions, as stated in Ruling Case Law, vol. 26, § 214, is that when a person mingles trust funds with his own funds so that the former cannot be segregated from the latter, the *cestui que trust* is entitled to a charge upon the new investment to the extent of the trust money traceable to it.

An interesting discussion of this subject is found in vol, 3 of Scott on Trusts, § 517, beginning on page 2470. It will be noted that the text writer in the section referred to deals with one who is a "conscious wrongdoer" for it is said: "Where a person who is a conscious wrongdoer mingles money of the claimant with money of his own and thereafter withdraws and dissipates a part of the mingled fund, the claimant is entitled to enforce an equitable lien upon the part of the fund which remains. . . . If the balance is equal to or greater than the amount of his claim, he will obtain full satisfaction. If the balance is less than the amount of his claim, he is entitled to the whole of the balance, . . ."

At page 2471 of the same text there is this comment: "Unfortunately, however, the courts have frequently dealt with the rights of the claimant as though they depended on the determination of the question whether the part withdrawn or the part remaining is the claimant's

money. In the attempt to answer the question, since it is impossible to determine as a matter of fact which part is the claimant's money because his money has been inextricably mingled with that of the wrongdoer, the courts are driven to employ presumptions and fictions. They have assumed that the rights of the claimant depend on the intention of the wrongdoer in making withdrawals. They recognize, however, that his actual intention, at least where he is a conscious wrongdoer, is immaterial. They therefore resort to artificial rules as to his presumed intention. At various times the courts have applied the following presumptions: (1) The withdrawals are presumed to be in the same order in which the contributions were made to the fund; (2) the wrongdoer is presumed to have withdrawn his own money first; (3) the wrongdoer is presumed to have acted honestly, and [to have] taken whatever course is more beneficial to the claimant."[1]

The question is asked by appellant, Was Mrs. Williams required to maintain herself from her separate property, if such proved sufficient, or was she permitted to use a part (or all, if necessary) of her husband's estate, at her discretion?

Our answer is that pertinent decisions of this court seem to hold that where money or its equivalent was bequeathed in circumstances similar to those pertaining

[1] Further commenting on the rule, it is said in Scott on Trusts, v. 3, p. 2473: "Although the presumption that withdrawals are in the same order as that of the deposits has been abandoned, many courts still seem to think it necessary to apply a presumption in order to determine whether the part withdrawn is the claimant's money or the wrongdoer's money. Accordingly, it is stated in many cases that the wrongdoer is presumed to have withdrawn his own money first. In some of the cases this is simply stated as a rule of law. In others the court seems to take the view that the rights of the claimant depend upon the intention of the wrongdoer in making the withdrawals, but they invoke a presumption that he intends to withdraw his own money first. It seems clear, however, that his intention is quite immaterial where he was a conscious wrongdoer in mingling the funds. . . ."

The rule was stated by Chief Justice McCulloch in *Powell* v. *Missouri & Arkansas Land & Mining Company,* 99 Ark. 553, 139 S. W. 299. Quoting from a discussion by Sir George Jessel and his associates in the case *In re Hallett's Estate,* 13 Chan. Div. 696, which was referred to by Mr. Justice Riddick in *Oswego Milling Co.* v. *Skillern,* 73 Ark. 324, 84 S. W. 475, there is the following: "The simplest case put is the mingling of trust moneys in a bag with money of the trustee's own. Suppose he has a hundred sovereigns in a bag, and he adds to them another hundred sovereigns of his own, so that they are mingled in such a way that they cannot be distinguished, and the next day he draws out for his own purposes one hundred pounds, is it tolerable for anybody to allege that what he drew out was the first one hundred pounds, the trust money, and that he misappropriated it, and left his own one hundred pounds in the bag? It is obvious he must have taken away that which he had a right to take away, his own hundred pounds. . . ."

to the case at bar, only the interest or income could be consumed, unless there were words in the will authorizing greater latitude of use. *Dillen* v. *Fancher*, 193 Ark. 715, 102 S. W. 2d 87; *Galloway* v. *Sewell*, 162 Ark. 627, 258 S. W. 655.

We do not maintain that this is the universal rule. Other jurisdictions, in construing the rights of a beneficiary bestowed by wills wherein the language was somewhat similar to that appearing in the instant document, hold that title immediately vests absolutely. Cases cited by appellant apparently contrary to our decisions are shown in the margin.[2]

In all of the cases results turn on particular words used in the will; but there is a lack of harmony in the result.

Since we have twice held that Mrs. Williams took only for life, with remainder to her husband's heirs, and since the method of accounting precludes any intelligible seperation of the sources from which expenditures were made, we must again hold that appellants are without provable equities, and the decree must be affirmed. It is so ordered.

---

2 *Board of Trustees of Westminster College* v. *Dimmitt*, 113 Mo. App. 41, 87 S. W. 536; *In re Nichols Estate*, 93 Neb. 80. 139 N. W. 719; *In re Richey's Estate*, 251 Pa. 324, 96 Atl. 748; *Edwards* v. *Williamson*, 202 Ala. 483, 80 So. 867; *In re Welsh's Estate*, 239 Pa. 616, 86 Atl. 1091; *Rountree* v. *Dixon*, 105 N. C. 350, 11 S. E. 158.