638 S.E.2d 144 (2006)
STATE of West Virginia ex rel. INSURANCE COMMISSIONER OF THE STATE OF WEST VIRGINIA, Petitioner Below,
West Virginia Hospital Association, Intervenor,
West Virginia State Medical Association, Intervenor,
v.
BLUE CROSS AND BLUE SHIELD OF WEST VIRGINIA, INC., Respondent Below, Appellee, and
United Mine Workers of America, International Union, Intervenor Below, Appellant,
v.
Receiver of Blue Cross and Blue Shield of West Virginia, Inc., Respondent Below, Appellee.
No. 32979.
Supreme Court of Appeals of West Virginia.
Submitted: September 6, 2006.
Decided: October 5, 2006.
*147 Bradley J. Pyles, Pyles, Haviland, Turner & Smith, Logan, for Appellant UMWA.
Anthony J. Cicconi, Shaffer & Shaffer, Charleston, for W.V. Hospital Association.
Don R. Sensabaugh, Jaclyn A. Bryk, Flaherty Sensabaugh & Bonasso, Charleston, for W.V. Medical Association.
Robert L. Greer, Clarksburg, for Blue Cross & Blue Shield.
Christopher S. Smith, Hoyer, Hoyer & Smith, Charleston, for Appellee Receiver.
DAVIS, C.J.
This appeal was brought by the International Union, United Mine Workers of America, appellant/intervenor below (hereinafter "UMWA"), from an order of the Circuit Court of Kanawha County that granted summary judgment in favor of the Receiver of Blue Cross and Blue Shield of West Virginia, appellee/applicant (hereinafter "Receiver").[1] This matter arose out of a delinquency proceeding[2] involving Blue Cross and Blue Shield of West Virginia (hereinafter "Blue Cross").[3] During the delinquency proceeding, UMWA intervened and filed a claim with the Receiver for the return of money it had previously given to Blue Cross. UMWA argued that the money was given to Blue Cross as a trust fund and was therefore not part of the liquidation estate of Blue Cross or, alternatively, that the money was a secured claim or special deposit. The Receiver rejected UMWA's contentions and found that, for priority payment purposes, UMWA had a general unsecured creditor claim.[4] The circuit court appointed a referee to make recommendations on how to resolve the dispute. The parties filed cross-motions for summary *148 judgment with the referee. The referee issued findings of fact and conclusions of law and recommended denying UMWA's motion for summary judgment and granting the Receiver's motion for summary judgment. The circuit court adopted the referee's findings of fact, conclusions of law and recommendations. In this appeal, UMWA contends that the circuit court committed error in finding that its claim was not a trust and therefore outside the liquidation estate of Blue Cross.[5] After consideration of the arguments of the parties and a careful review of the briefs and record, we reverse the circuit court's order and remand this case for entry of an order granting UMWA's motion for summary judgment.

I.

FACTUAL AND PROCEDURAL HISTORY
On April 7, 1986, UMWA and Blue Cross entered into an agreement that created a one year program called the "UMWA Emergency Care Pilot Program" (hereinafter "Emergency Care Program").[6] The Emergency Care Program was created for the purpose of providing a health insurance plan to unemployed or involuntarily laid off UMWA members and their dependents.[7] Under the terms of the agreement, UMWA tendered to Blue Cross the sum of $1,000,000.00.[8] The agreement obligated Blue Cross to invest the money at an annual interest rate which was not less than one percent greater than the yield on a one year Treasury Bill. At the end of the one year expiration of the Emergency Care Program, Blue Cross was obligated to return the one million dollars and to turn over all interest earned after an additional one year "claims run-out period."[9]
The record indicates that after the Emergency Care Program expired, the parties entered into another, essentially identical, one year agreement.[10] The second agreement covered the period of April 1, 1987, to March 31, 1988. Subsequent to the expiration of the second agreement, the parties entered a third agreement, which was also essentially identical to the first agreement.[11] The third agreement covered the period of April 1, 1988, to March 31, 1989. When the third agreement expired, the parties did not enter into a new formal written agreement. However, the parties agreed that the Emergency Care Program would continue until April 30, 1990.
When the Emergency Care Program ended on April 30, 1990, Blue Cross did not return the one million dollars. In May of 1990, the parties agreed that beginning on July 1, 1990, the interest UMWA was entitled to receive would be paid on a monthly basis. In June of 1990, Blue Cross proposed returning the one million dollars to UMWA in January of 1991. UMWA rejected the proposal. However, Blue Cross unilaterally set up a special sinking fund that it paid into *149 monthly for the purpose of generating the one million dollars owed to UMWA. The last deposit into the sinking fund was made on October 9, 1990, at which time the sinking fund had a value of $710,748.49.[12]
On or about October 24, 1990, the Insurance Commissioner filed an Application for Liquidation Order and Injunction against Blue Cross.[13] The circuit court entered an order on October 26, 1990, approving a liquidation delinquency proceeding against Blue Cross and appointing the Insurance Commissioner as Receiver.[14] In 1991, UMWA filed a motion to intervene in the delinquency proceeding. The circuit court granted the motion on April 2, 1991. By letter dated July 2, 1991, UMWA filed a claim with the Receiver for the money owed to it by Blue Cross. Specifically, UMWA sought the return of $1,088,148.13[15] on the following grounds: (1) the money was exempt from the liquidation estate of Blue Cross because it was held as a trust or (2) if the money was deemed part of the estate, it was a secured claim or special deposit claim under the applicable statute. The Receiver issued a Notice of Determination on June 22, 1992, wherein it was held that UMWA had a general unsecured claim, and that it was likely that the funds of the estate were insufficient to pay general unsecured claims.[16] On August 11, 1992, UMWA filed an objection to the Receiver's determination.[17]
After UMWA filed its objection to the Receiver's ruling, the circuit court entered an amended order on March 12, 1993, appointing a referee to take evidence regarding the dispute and to make recommendations to the court.[18] After an extensive period of discovery, the Receiver filed a motion for summary judgment with the referee on August 10, 2000. On September 2, 2000, UMWA filed a response and cross-motion for summary judgment.[19] The referee filed findings of fact and conclusions of law, with a recommendation that summary judgment be granted to the Receiver and that UMWA's motion for summary judgment be denied. By order entered May 10, 2005, the circuit court adopted the referee's findings of fact, conclusions of law and recommendations. UMWA thereafter filed this appeal.

II.

STANDARD OF REVIEW
The statute in place when this delinquency proceeding began stated that an objection to a Receiver's decision "may be heard by the court or by a court-appointed referee who shall submit findings of fact along with his recommendation." W. Va. *150 Code § 33-24-25(d) (1990).[20] The clear intent of this statute is to permit a "bench" proceeding in delinquency proceedings, but not a jury trial. The instant case was submitted to the referee, and ultimately the circuit court, on cross-motions for summary judgment.[21] In deciding the facts and rendering its conclusions of law and recommendations, the referee considered the briefs and reviewed the voluminous record developed during discovery, including deposition testimonies.[22] The circuit court adopted in full the referee's findings of fact, conclusions of law and recommendations.[23] Under these circumstances, this Court is obligated to apply our standard of review applicable to summary judgment in ordinary civil actions.[24] We have held that "[a] circuit court's entry of summary judgment is reviewed de novo." Syl. pt. 1, Painter v. Peavy, 192 W.Va. 189, 451 S.E.2d 755 (1994).[25] Furthermore, this Court has indicated that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York, 148 W.Va. 160, 133 S.E.2d 770 (1963).

III.

DISCUSSION
In granting summary judgment to the Receiver, the circuit court found that the undisputed facts showed that UMWA's claim was that of a general unsecured creditor. UMWA has argued that it was entitled to summary judgment because the undisputed facts established that the one million dollars it gave to Blue Cross was a trust and therefore outside the liquidation estate or, alternatively, that the money was a secured claim. In resolving this matter we need only address UMWA's first contention. In doing so, several issues must be resolved: (1) was a trust created, (2) was the trust destroyed when the last formal written agreement expired, (3) was the trust destroyed because of commingling, and (4) can the trust fund be traced. Each of these issues will be addressed separately.

A. A Trust Was Created
The brief of UMWA indicates that the summary judgment order of the circuit court "does not specifically address the question of whether or not a trust was created by the agreement of April 1, 1986, although the order apparently implicitly assumes that a trust was created." We agree with this observation. Further, we find that a trust did in fact exist between UMWA and Blue Cross.
It was held in Syllabus point 1 of Straton v. Aldridge, 121 W.Va. 691, 6 S.E.2d 222 (1939), that "[a]n express trust must be based on an agreement, express or implied, or on a clear declaration of trust by its *151 creator." This Court observed in Keller v. Washington, and we now hold, that
[w]here a person, not acting merely as agent, has or accepts possession and control of money, promissory notes, or other personal property, with the express or implied understanding that he is not to hold it as his own absolute property, but is to hold and apply it for certain specific purposes, or for the benefit of certain specified persons, a valid and enforceable trust exists.
83 W.Va. 659, 666, 98 S.E. 880, 883 (1919) (citations omitted).
On three separate occasions, UMWA and Blue Cross entered into written agreements regarding the conveyance of the one million dollars. Each agreement contained an Appendix A that set forth the exact same conditions as follows:
[Blue Cross] and [UMWA] hereby agree as follows:
Within thirty (30) days from the effective date herein, [UMWA] will remit to [Blue Cross] the sum of One Million Dollars ($1,000,000.00) to be held by [Blue Cross] for [UMWA] IN TRUST in accordance with the following terms and conditions:
A. The term of the trust shall be one year, commencing from the date that [Blue Cross] is in receipt of the trust corpus amount.
B. [Blue Cross] shall invest the trust corpus at an annual interest rate which is no less than one percent (1%) greater than the current yield to maturity on a one year Treasury Bill. [Blue Cross] shall provide [UMWA] a monthly written statement setting forth the interest amount earned on the trust corpus.
C. At the end of the one year term described herein, the entire trust corpus ($1,000,000.00) shall be returned to the [UMWA] by [Blue Cross]. Further, [Blue Cross] at that time shall provide [UMWA] a written statement setting forth the amount of interest earned on the trust corpus during the term of the trust. Said interest amount shall then be invested by [Blue Cross] for a one year period ("investment period") at an annual interest rate that is no less than one percent (1%) greater than the current yield to maturity on a one year Treasury Bill.
D. Upon the termination of the Group Enrollment Agreement, there shall be established a one year period known as the "claims run-out period." During that time, [Blue Cross] shall pay all claims, subject to the terms and conditions of the membership certificate, incurred by the [UMWA's] members prior to the termination date. [Blue Cross] is under no obligation, either express or implied, to pay any additional such claims after the expiration of the "claims run-out period."
E. At the end of the investment period described in Section C, [Blue Cross] shall provide [UMWA] a written statement setting forth the amount of claims paid by [Blue Cross] under the terms of this certificate, plus [Blue Cross'] retention charge of eleven and five hundredths percent (11.05%) of the aforesaid claims amount. In the event that said paid claims plus [Blue Cross'] retention charge exceed the premiums received by [Blue Cross] from the [UMWA's] members, then [Blue Cross] shall retain an additional amount equal to such excess from the interest amounts earned during the one-year term of the trust and the investment period described in this Appendix A. The remaining interest earned, however, shall be returned by [Blue Cross] to [UMWA]. In no event shall [UMWA] be required to pay [Blue Cross] an amount greater than the interest amount earned during the term of the trust and the investment period, regardless of the total amount of claims paid.
Under Appendix A, Blue Cross received one million dollars from UMWA for the specific purpose of investing it at an annual interest rate that was at least 1% greater than a one year Treasury Bill. Appendix A required Blue Cross to return the one million dollars after one year. The limitations contained in Appendix A are consistent with the requirements of Keller for creating a trust. Consequently, we find that for the three years in which the parties executed an agreement containing Appendix A, a valid trust was created.

*152 B. The Trust Was Not Destroyed When the Last Formal Written Agreement Expired

The record indicates that when the third written agreement expired on April 1, 1989, Blue Cross and UMWA did not enter into a similar written agreement. Regarding this fact, the circuit court found that "UMWA is not the beneficiary of an express trust for the reason the express trust established in Appendix A to the parties' most recent agreement expired by its own terms on April 1, 1989." This conclusion of law by the circuit court is inconsistent with its findings of fact and the law pertaining to the creation and termination of a trust.
First, in its findings of fact section, the circuit court's order concluded:
No further written agreements were entered between the parties with respect to the UMWA Emergency Care Program following termination of the third agreement on March 31, 1989. . . . However, [the parties] agreed to continue the Emergency Care Program until April 30, 1990, when it was terminated. The $1,000,000.00 was not returned to the UMWA following the Program's termination.
This finding of fact does not support the circuit court's legal conclusion that the trust expired on April 1, 1989. To the contrary, this finding of fact indicates that Blue Cross and UMWA agreed to continue the trust[26] for another year that ended April 30, 1990.[27]
Second, the mere fact that no formal written trust agreement was entered into by Blue Cross and UMWA to continue the trust for another year is not relevant.[28] It has been recognized that "the required manifestation of intention to create a trust in [personalty] may be written or spoken or by conduct." Restatement (Third) of Trusts, § 13 at 207 (2003). In fact, it has been recognized by statute,[29] and we expressly hold, that when a trust is created through the conveyance of personal property to another person, either in trust for the person making the conveyance, or in trust for a third person, no writing is required.[30]See *153 Everly v. Schoemer, 139 W.Va. 392, 395, 80 S.E.2d 334, 337 (1954) ("It is unnecessary to have [a trust] agreement in writing to enforce such trust, and the trust may be shown by oral evidence."); Boggs v. Yates, 101 W.Va. 407, 409, 132 S.E. 876, 876 (1926) ("At common law no particular form of creation or declaration of a trust . . . was required. It could be by deed, or will, or writing not under seal, or mere word of mouth."); Hudkins v. Crim, 64 W.Va. 225, 227, 61 S.E. 166, 166 (1908) ("[An] oral trust, though not created or manifested in writing, [is] enforced in equity in West Virginia."). Therefore, the parties could and in fact did continue the trust until April 30, 1990, even though no new formal written trust agreement was created. Further, there is nothing in the record to show that the informal extension of the last formal written trust agreement compromised the trust, or allowed Blue Cross to have greater rights to the corpus of the trust than was authorized under Appendix A.
Finally, assuming for the sake of argument, that the trust agreement was not extended after the April 1, 1989, termination date, this fact alone did not destroy the trust. This Court has previously held that "[a] trust does not ordinarily terminate automatically when the time for the termination arrives because the duties of the trustees do not cease upon such termination but continue until their duties have been completed." Syl. pt. 3, Guthrie v. First Huntington Nat'l Bank, 155 W.Va. 496, 184 S.E.2d 628 (1971). See William F. Fratcher, Scott on Trusts § 344, at 543-44 (4th ed. 1989) ("[A] trust ordinarily does not automatically terminate merely because the time for distribution has arrived; it is terminated only when the trustee has finally accounted [for] and conveyed the trust property to the persons entitled to it on the termination of the trust."). Insofar as there was no evidence showing that Blue Cross returned the trust corpus and interest to UMWA on or shortly after April 1, 1989, the trust would have continued to exist.[31]See Swoboda v. United States, 258 F.2d 848, 850 (3rd Cir.1958) (explaining that a trust of personalty does not terminate until the trustee has transferred the corpus to the beneficiary); Commissioner of Internal Revenue v. Davis, 132 F.2d 644, 646 (1st Cir.1943) (same); Ridgely v. Pfingstag, 188 Md. 209, 50 A.2d 578, 588 (1946) (same); Wachovia Bank & Trust Co. v. Taliaferro, 246 N.C. 121, 97 S.E.2d 776, 782 (1957) (same); In re Thaw's Estate, 163 Pa.Super. 484, 63 A.2d 417, 420 (1949) (same).

*154 C. The Trust Was Not Destroyed Because of Commingling

The record indicates that on April 9, 1986, UMWA conveyed the trust fund of one million dollars to Blue Cross. The money was placed in Blue Cross' general operating account and was not segregated or earmarked as UMWA trust money. After the trust fund was deposited, numerous transactions occurred with Blue Cross' general operating account, including the deposit of additional millions of dollars and the removal of millions of dollars for investment in security instruments. As a result of Blue Cross' failure to distinguish UMWA's trust fund as a deposit or investment, the circuit court concluded that the trust was destroyed. The Receiver and Intervenors also argue that the commingling of UMWA's trust money destroyed the trust. UMWA contends that "[i]t is immaterial that there were numerous transfers of funds out of the general account, or between the general account and investment account. As long as the balance in the two accounts exceeded $1 million, $1 million of that balance is conclusively presumed to be the trust property." We agree with UMWA to the extent that it contends that mere commingling of trust funds did not destroy the trust.
At the outset we will note that "[i]t is the duty, among other things, of [a] trustee . . . to keep the property and fund thus intrusted to him separate and distinct from his individual funds." Syl. pt. 2, in part, Wagner v. Coen, 41 W.Va. 351, 23 S.E. 735 (1895). That is, "in the absence of an agreement to the contrary, the trustee must keep [trust funds] separate from his own funds." Tyler v. State of California, 134 Cal.App.3d 973, 185 Cal.Rptr. 49, 52 (1982). See also Frontier Excavating, Inc. v. Sovereign Constr. Co., 30 A.D.2d 487, 294 N.Y.S.2d 994, 998 (1968) ("A trustee has a duty . . . to . . . keep trust funds separate from his own[.]"); Engstrom v. Larson, 77 N.D. 541, 44 N.W.2d 97, 109 (1950) ("The trustee is under a duty to the beneficiary to keep the trust property separate from his individual property."); Winger v. Chicago City Bank & Trust Co., 394 Ill. 94, 67 N.E.2d 265, 277 (1946) ("[T]here is a duty resting upon trustees not to commingle their own property with that of the beneficiaries[.]"); George G. Bogert and George T. Bogert, The Law of Trusts and Trustees § 596, at 458 (2d ed. 1980) ("It is not only the duty of the trustee to earmark trust assets but also to keep them separate from the property of the trustee[.]"); Restatement (Second) of Trusts § 179, at 385 (1959) ("The trustee is under a duty to the beneficiary to keep the trust property separate from his individual property, and, so far as it is reasonable that he should do so, to keep it separate from other property not subject to the trust, and to see that the property is designated as property of the trust."). In this proceeding, the evidence is clear in showing that Blue Cross violated its duty to earmark UMWA's trust fund and to keep it separate from its own funds.
This Court addressed the issue of commingling trust funds in the case of Henson v. Lamb, 120 W.Va. 552, 199 S.E. 459 (1938). In Henson, the plaintiff deposited a sum of money with a bank for the express purpose of paying off a note that was held by an insurance company. The bank, acting as agent of the insurer, accepted the money and agreed to pay the money to the insurer when it was due. The bank became insolvent and went into receivership before it paid the insurer. The plaintiff filed an action against the bank's receiver in order to have the money he deposited with the bank declared a trust and payable ahead of general creditors.[32] The circuit court granted the relief sought by the plaintiff, and the receiver appealed. In resolving the appeal, this Court addressed the issue of commingling trust funds with a trustee's assets. The Court stated its position as follows:
Trust funds do not lose their character as such because they are commingled with those of the trustee. Once a trust is created, it cannot be destroyed by the action, wrongful or innocent, of the trustee, in the absence of the intervening right of a purchaser for value without notice.
*155 Syl. pt. 4, Henson, 120 W.Va. 552, 199 S.E. 459.[33]See also Syl. pt. 4, Ream's Drug Store v. Bank of the Monongahela Valley, 115 W.Va. 66, 174 S.E. 788 (1934) ("A deposit impressed with the character of a trust fund does not lose that impression through commingling with the general funds of the bank."); Syl. pt. 1, in part, Sullivan v. Madeleine Smokeless Coal Co., 115 W.Va. 115, 175 S.E. 521 (1934) ("Trust funds in the control of an employer do not lose their character as such merely because they are commingled with other funds[.]").
We need not dwell on the issue of commingling. Our prior cases, as well as other jurisdictions, have made clear that a trustee's commingling of trust funds with its own funds will not, in and of itself, destroy a trust. See Bell v. Killian, 266 Ala. 12, 93 So.2d 769, 778 (1957); Hurst v. Hurst, 1 Ariz.App. 603, 405 P.2d 913, 917 (Ariz.Ct. App.1965); Chambers v. Williams, 199 Ark. 40, 132 S.W.2d 654, 656 (1939); Elliott v. Elliott, 231 Cal.App.2d 205, 41 Cal.Rptr. 686, 688 (1964); Cotting v. Berry, 50 Colo. 217, 114 P. 641, 643 (1911); Curran v. Smith-Zollinger Co., 151 A. 217 (Del.Ch.1930); Myers v. Matusek, 98 Fla. 1126, 125 So. 360, 366 (1929); Adler v. Hertling, 215 Ga.App. 769, 451 S.E.2d 91, 97 (1994); In re Comm'r of Banks & Real Estate, 327 Ill.App.3d 441, 261 Ill.Dec. 775, 764 N.E.2d 66, 100 (2001); Ross v. Thompson, 128 Ind.App. 89, 146 N.E.2d 259, 266 (1957); State v. Hawkeye Oil Co., 253 Iowa 148, 110 N.W.2d 641, 648 (Iowa 1961); Matter of Miller's Estate, 225 Kan. 655, 594 P.2d 167, 170 (1979); Farmers' Bank of White Plains v. Bailey, 221 Ky. 55, 297 S.W. 938, 939 (1927); D.T. & A.T. Lee v. First Nat'l Bank, 18 La.App. 586, 139 So. 63, 65 (1932); Brown v. Coleman, 318 Md. 56, 566 A.2d 1091, 1097 (1989); Feeney v. Feeney, 335 Mass. 534, 140 N.E.2d 642, 645 (1957); Blair v. Trafco Prods., Inc., 142 Mich.App. 349, 369 N.W.2d 900, 903 (1985); Petersen v. Swan, 239 Minn. 98, 57 N.W.2d 842, 846 (1953); Holliman v. Demoville, 243 Miss. 542, 138 So.2d 734, 736 (1962); In re Myers' Estate, 376 S.W.2d 219, 222 (Mo. 1964); Bennett v. Glacier Gen. Assur. Co., 259 Mont. 430, 857 P.2d 683, 685 (1993); In re Estate of Redpath, 224 Neb. 845, 402 N.W.2d 648, 651 (1987); Division of Employment Sec. v. Pilot Mfg. Co., 83 N.J.Super. 177, 199 A.2d 78, 81 (1964); Daughtry v. International Bank of Commerce, 18 N.M. 119, 134 P. 220, 221 (N.M.1913); General Motors Acceptance Corp. v. Norstar Bank, N.A., 141 Misc.2d 349, 532 N.Y.S.2d 685, 687 (1988); Michigan Nat'l Bank v. Flowers Mobile Homes Sales, Inc., 26 N.C.App. 690, 217 S.E.2d 108, 111 (1975); Engstrom v. Larson, 77 N.D. 541, 44 N.W.2d 97, 109 (1950); In re Graham's Estate, 98 N.E.2d 104, 111 (Ohio Prob.Ct.1950); Boroughs v. Whitley, 363 P.2d 150, 152 (Okla.1961); Montgomery v. U.S. Nat'l Bank of Portland, 220 Or. 553, 349 P.2d 464, 473 (1960); In re Paxson Trust I, 893 A.2d 99, 129 (2006); In re Erie Trust Co. of Erie, 326 Pa. 198, 191 A. 613, 617 (1937); Want v. Alfred M. Best Co., 233 S.C. 460, 105 S.E.2d 678, 701 (S.C.1958); Farmers' Sav. Bank v. Bergin, 52 S.D. 1, 216 N.W. 597, 599 (1927); State ex rel. Robertson v. Thomas W. Wrenne & Co., 170 Tenn. 131, 92 S.W.2d 416, 418 (1936); Flournoy v. Wilz, 201 S.W.3d 833, (Tex.Ct.App.2006); Tooele County Bd. of Educ. v. Hadlock, 79 Utah 478, 11 P.2d 320, 324 (1932); First Nat'l Bank v. Commercial Bank & Trust Co., 163 Va. 162, 175 S.E. 775, 779 (Va.1934); Westview Invs., Ltd. v. U.S. Bank Nat'l Ass'n, 133 Wash.App. 835, 138 P.3d 638, 644 (2006); Simonson v. McInvaille, 42 Wis.2d 346, 166 N.W.2d 155, 159 (Wis.1969); City of Casper v. Joyce, 54 Wyo. 198, 88 P.2d 467, 470 (1939).

D. The Trust Fund Can Be Traced
The Receiver indicated in its brief that it has approximately $2,449,000.00 with which to pay creditors of Blue Cross. In spite of this amount, the circuit court concluded that, because Blue Cross commingled the trust fund with its own funds, "the $1,000,000.00 deposit made by UMWA on April 9, 1986, cannot be traced with any confidence to property in the hands of the Receiver as of the date of the Order of Liquidation." Additionally, the circuit court concluded, as pointed *156 out in the Receiver's brief, "that even if the trace were proven, the [UMWA] could not rely on a trace theory because tracing was an equitable remedy barred in liquidation proceedings by W. Va.Code, § 33-24-27." We disagree with both conclusions.
1. W. Va.Code § 33-24-27 is inapplicable to UMWA's claim. In order for UMWA to locate its trust fund, it must resort to the equitable remedy of tracing.[34] However, for the purpose of liquidation proceedings, W. Va.Code § 33-24-27 (1996) provides, in relevant part, that "[n]o claim by a policyholder or other creditor shall be permitted to circumvent the priority classes through the use of equitable remedies."[35] (Emphasis added). UMWA contends that this statute is not applicable to its claim. The Receiver and Intervenors argue that the statute is enforceable against UMWA's claim because UMWA is a mere creditor.
To begin, we observe that there is nothing ambiguous about the statute's prohibition of using equitable remedies to assist a "policyholder or other creditor" to circumvent the priority payment classes established under the statute. Consequently, we may not construe the statute's language. This Court has held that "[a] statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." Sizemore v. State Farm Gen. Ins. Co., 202 W.Va. 591, 596, 505 S.E.2d 654, 659 (1998) (internal quotations and citation omitted). That is, "[w]here the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. pt. 2, Crockett v. Andrews, 153 W.Va. 714, 172 S.E.2d 384 (1970).
By its express terms, W. Va.Code § 33-24-27 bars the use of an equitable remedy to give priority to a debt owed to a creditor or policyholder.[36] The statute does not, however, prohibit the use of an equitable remedy to locate trust property for priority payment purposes.[37]
Insofar as W. Va.Code § 33-24-27 would prohibit using the trace doctrine for the benefit of a creditor, the statute is consistent with the common law. That is, the general rule is that "the simple relation of debtor and creditor is not sufficient grounds for invoking the [trace] doctrine[.]" General Motors Acceptance Corp. v. Thompson, 70 N.D. 99, 292 N.W. 85, 88 (1940) (internal quotations and citation omitted).
The trace doctrine has been commented upon as follows:
The right of a . . . trust [beneficiary] to follow his trust money or other property into the hands of the receiver of the insolvent trustee . . . is based upon rights of property. The theory is that the funds are still the property of the . . . trust [beneficiary], whether in their original or in some altered or substituted form. This right to follow and recover trust funds or property is not based upon any relationship of debtor and creditor or upon a debt due and owing, nor does it rest on the ground of compensation for the loss of the property or fund.
Lencioni v. Folk, 109 Ind.App. 519, 36 N.E.2d 980, 982 (1941) (internal quotations and citation omitted). See also Andrew v. State Bank of New Hampton, 205 Iowa 1064, *157 217 N.W. 250, 252 (Iowa 1928) ("The . . . owner of a trust fund traced to the possession of another has the right to have it restored, not as his debt due and owing, but because it is his property wrongfully withheld from him."). In the final analysis, the right to trace and "to recover a trust fund or property . . . from the representative of the insolvent [trustee] is based solely upon the theory that since title to the fund or property claimed did not pass to the [trustee], he is, in effect, recovering his own converted property or the proceeds therefrom." In re Ogden State Bank, 94 Utah 61, 75 P.2d 313, 316 (1938) (internal quotations and citation omitted). This Court held in syllabus point 5 of Ream's Drug Store v. Bank of the Monongahela Valley, 115 W.Va. 66, 174 S.E. 788 (1934), that "[s]o long as a trust fund or its product can be identified, equity will follow it."
In the instant proceeding, the circuit court found that, insofar as the trust was destroyed, a debtor-creditor relationship existed between UMWA and Blue Cross. It was only because of the purported destruction of the trust that the circuit court found that W. Va.Code § 33-24-27 barred using the trace remedy. We have already determined that, contrary to the circuit court's conclusion, the trust was never destroyed. Thus, the trace doctrine may be used to locate the trust funds.
2. The trust fund can be traced to assets held by the Receiver. The circuit court found that UMWA's efforts at tracing the trust fund failed because it amounted to conjecture and speculation. In order to determine whether UMWA's trust fund can be traced to funds in the possession of the Receiver, we must first set out a few principles of law applicable to tracing trust funds.
Courts take the position generally that "when trust funds are commingled with other funds, the trust may be enforced against any part of the commingled fund which can be traced into the hands of a trustee." Simonson v. McInvaille, 42 Wis.2d 346, 166 N.W.2d 155, 159 (Wis.1969). See also Hurst v. Hurst, 1 Ariz.App. 603, 405 P.2d 913, 917 (Ariz.Ct.App.1965) ("If a trustee mixes trust funds with his own, the entire commingled mass should be treated as trust property except in so far as the trustee may be able to distinguish what is his."); Matter of Miller's Estate, 225 Kan. 655, 594 P.2d 167, 170 (1979) ("If trust funds have been commingled with other funds, the person equitably entitled thereto may follow the funds and is entitled to have the trust funds reclaimed and taken out of the assets with which they are commingled."); LaBarbera v. LaBarbera, 116 Ill. App.3d 959, 72 Ill.Dec. 431, 452 N.E.2d 684, 689 (1983) ("Under Illinois law, a fund impressed with a trust may be traced into a fund of commingled money."); In re Flasch, 51 N.J.Super. 1, 143 A.2d 208, 223 (1958) ("The law is settled that where a fiduciary commingles trust funds with his own, equity imposes a trust upon the entire fund[.]"); Application of Lyon, 2 A.D.2d 255, 153 N.Y.S.2d 866, 868 (1956) ("[W]here funds in the hands of an executor or trustee are commingled with personal funds of the fiduciary officer, all of his funds are impressed with a trust."); Moody v. Pitts, 708 S.W.2d 930, 937 (Tex.Ct.App.1986) ("If a trustee commingles trust funds with the trustee's own, the entire commingled fund is subject to the trust."). Courts which take the position that all funds remaining with a trustee may be subject to the trust, do so on the theory that "where the trustee commingles trust funds with his own and subsequently withdraws sums from the combined fund for his own use, the conclusive presumption is that the trustee withdrew his own funds first." Sadacca v. Monhart, 128 Ill.App.3d 250, 83 Ill.Dec. 463, 470 N.E.2d 589, 594 (1984).
It has been observed that "[i]n cases where the trust property has been commingled, courts resolve the issue with reference to the so-called `lowest intermediate balance' rule[.]" In re Dameron, 155 F.3d 718, 724 (4th Cir.1998).[38]Accord In re MJK Clearing, Inc., 371 F.3d 397, 402 (8th *158 Cir.2004); In re Columbia Gas Sys. Inc., 997 F.2d 1039, 1063 (3rd Cir.1993); Connecticut Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 619 (1st Cir.1988); Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville, 358 F.Supp. 317, 325 (E.D.Mo.1973); Metropolitan Nat'l Bank v. La Sher Oil Co., 81 Ark.App. 269, 101 S.W.3d 252, 255 (2003); Chrysler Credit Corp. v. Superior Court, 17 Cal.App.4th 1303, 22 Cal.Rptr.2d 37, 44 (1993); Matter of Miller's Estate, 225 Kan. 655, 594 P.2d 167, 170 (1979); Central Prod. Credit Ass'n v. Hans, 189 Ill.App.3d 889, 137 Ill.Dec. 302, 545 N.E.2d 1063, 1073 (1989); Ellefson v. Centech Corp., 606 N.W.2d 324, 336 (Iowa 2000); Bennett v. Glacier Gen. Assurance Co., 259 Mont. 430, 857 P.2d 683, 686 (1993); General Motors Acceptance Corp. v. Norstar Bank, N.A., 141 Misc.2d 349, 532 N.Y.S.2d 685, 687 (1988); Ayers v. Fay, 187 Okla. 230, 102 P.2d 156, 159 (1940); Barrs v. Barrs Rent-A-Car Co., 71 Ohio App. 465, 50 N.E.2d 388, 389 (Ohio Ct.App. 1943); Appeal of Mehler, 310 Pa. 25, 164 A. 619, 620 (1932). Specifically, and we hold, the lowest intermediate balance rule is used when a trustee withdraws money from a commingled fund and subsequently makes additions to that fund. Under the lowest intermediate balance rule, there exist three alternative scenarios: (1) if the amount on deposit in a commingled fund has at all times equaled or exceeded the amount of the trust, the monies of the trust will be returned in their full amount; (2) if the commingled fund has been depleted entirely, the trust is considered lost; and (3) if the commingled fund has been reduced below the amount of the trust but has not been depleted, the settlor is entitled to the lowest intermediate balance in the account. Restatement (Second) of Trusts § 202, at 451.[39]
In the instant case, the trust agreement between Blue Cross and UMWA required Blue Cross to invest the trust fund. Consequently, under the trace doctrine, UMWA could seek to locate the trust fund by examining Blue Cross' investment portfolio. The record indicates that UMWA did in fact attempt to trace the trust fund in Blue Cross' investment portfolio.
UMWA presented evidence showing that at the time the Receiver was appointed, Blue Cross had an investment portfolio containing seven Treasury Bonds with each having a face value of $1,000,000.00.[40] The evidence in this case showed that, while funds moved in and out of Blue Cross' investment portfolio, that portfolio was never below one million dollars during the period of the trust.[41]
*159 During the proceeding below, UMWA attempted to trace its trust fund through the movement of one of the seven bonds. The circuit court found that UMWA's evidence regarding that specific bond was conjecture and speculation. We agree. However, we do not believe that, under the unique facts of this case, UMWA was required to trace a specific bond. See Rivero v. Thomas, 86 Cal.App.2d 225, 238, 194 P.2d 533 (1948) ("The degree of identification of trust funds depends upon the circumstances surrounding each case.").
We believe that requiring UMWA to trace its trust fund to a specific bond in Blue Cross' investment portfolio is the equivalent of requiring UMWA to locate the exact dollars it wired to Blue Cross to establish the trust. It was not incumbent on UMWA "to identify the particular funds, for, as money has no earmarks, this would be practically impossible." Andrew v. State Bank of New Hampton, 205 Iowa 1064, 217 N.W. 250, 253 (Iowa 1928) (internal quotation marks and citation omitted). See Fratcher, Scott on Trusts, § 517, at 619 ("It is impossible and unnecessary to determine whether the claimant's money is included in the part withdrawn or in the part that remains."). It has been said that
[u]nder the modern doctrine prevailing in most . . . jurisdictions, it is not necessary, in order to follow and recover a trust fund from the receiver or other liquidating officer of an insolvent trustee . . ., to identify the specific money constituting the fund, or to point out the identical coins or bills which were originally placed in the custody of the [trustee], where the fund has been mingled with other funds [of] the [trustee].
Staley v. Kreinbihl, 152 Ohio St. 315, 89 N.E.2d 593, 598 (Ohio 1949) (internal quotation marks and citation omitted). This Court came to the same conclusion in Ream's Drug Store:
It is not important that the commingled money bore no mark, and cannot be identified. It is sufficient to trace it into the bank's vaults and find that a sum equal to it, and presumably representing it, continuously remained there until the receiver took it. The modern rules of equity require no more.
115 W.Va. at 74-75, 174 S.E. at 792 (internal quotations and citation omitted). Thus, "[i]f trust funds have been commingled with other funds, the person equitably entitled thereto may follow the funds and is entitled to have the trust funds reclaimed and taken out of the assets with which they are commingled." Matter of Miller's Estate, 225 Kan. 655, 594 P.2d 167, 170 (1979).
In this proceeding UMWA was able to open Blue Cross' "bank vault" and find seven investment instruments valued at one million dollars each.[42] UMWA needed to do no more, for it had traced the investment of its one million dollars.[43]See Appeal of Mehler, 310 Pa. 25, 164 A. 619, 620 (1932) ("Once the proceeds have been traced into some fund, the entire fund is subject to the trust until the amount wrongfully placed in it has been repaid[.]"). This conclusion is reached because there was no evidence which demonstrated that any of the seven bonds were earmarked for a special purpose.[44] The *160 bonds were designated simply as the property of Blue Cross, and, because of this fact, the Receiver was able to exercise its authority to have them sold.[45] In exercising such authority, the Receiver obtained UMWA's trust fund.

IV.

CONCLUSION
In view of the foregoing, we find that the circuit court committed error in granting summary judgment to the Receiver and denying the same to UMWA. We find that the undisputed material issues of fact show, as a matter of law, that UMWA is entitled to have summary judgment entered in its favor. Accordingly, we reverse the judgment in this case and remand for entry of an order granting UMWA summary judgment consistent with this opinion.[46]
Reversed and Remanded.
NOTES
[1] The Receiver in this case is the Insurance Commissioner of the State of West Virginia. The parties indicate that during the proceedings below Betty Cordial, the duly appointed Special Deputy Insurance Commissioner and Deputy Receiver, was the person who was actually responsible for handling the liquidation affairs of the estate of Blue Cross.
[2] "Delinquency proceeding," as defined by statute, "means any proceeding commenced against a corporation pursuant to [article 24] for the purpose of liquidating, rehabilitating, supervising, reorganizing or conserving such corporation." W. Va.Code § 33-24-14(d) (1991) (Repl. Vol.2003) (statute rewritten in 2004).
[3] When this matter began, the applicable delinquency statutes were found at W. Va.Code §§ 33-24-14 through 33-24-42. All of the statutes, except W. Va.Code § 33-24-14 (amended and rewritten in 2004) and W. Va.Code § 33-24-20 (repealed in 1991), were repealed in 2004. The amendment to W. Va.Code § 33-24-14 provides that delinquency proceedings against institutions that came under the repealed statutes are now governed by the provisions of W. Va.Code § 33-10-1 et seq. This amendment to W. Va. Code § 33-24-14 further provides that "[a]ny delinquency proceeding pending against a corporation subject to this article prior to the first day of July, two thousand four, will be administered and concluded under the law in effect at the time the delinquency proceeding was commenced." The parties to this proceeding agree that the repealed statutes apply to this case.
[4] The effect of classifying UMWA as an unsecured creditor meant that it would ultimately receive none of the money it had tendered to Blue Cross.
[5] While this matter was pending before the Court, motions to intervene were filed by the West Virginia State Medical Association and the West Virginia Hospital Association (hereinafter "the Intervenors"). The motions were granted and the Intervenors filed briefs urging this Court to affirm the circuit court's ruling. The Intervenors have indicated that, because of the limited funds available from the Blue Cross estate, if UMWA is permitted to recover the money it seeks, the Intervenors would not receive any of the money owed to them by Blue Cross.
[6] The agreement was made effective April 1, 1986.
[7] Pursuant to the agreement, program subscribers were charged a premium for coverage and benefits were to be paid by Blue Cross.
[8] The agreement was actually set out in two instruments called "Pilot Plan Group Enrollment Agreement" and "Appendix A." The text of the agreement involving the one million dollars was set out in Appendix A, and is reproduced infra in Section III. A. of this opinion.
[9] The agreement allowed Blue Cross to retain part or all of the interest in the event of a shortfall of premium income.
[10] The parties agreed that the one million dollars given to Blue Cross would remain with Blue Cross for the new twelve month investment period. Interest on the money, in the amount of $69,909.87, was paid to UMWA on May 7, 1987.
[11] It was agreed by the parties that the initial one million dollars given to Blue Cross would be retained by Blue Cross for the new twelve month investment period. Interest on the money, in the amount of $87,078.72, was paid to UMWA on June 14, 1988.
[12] After Blue Cross went into receivership, the sinking fund money was transferred into a general account with all other assets of Blue Cross.
[13] The Insurance Commissioner's application alleged that Blue Cross was insolvent at the end of 1989 and had a negative estimated balance of $32,972,179.00.
[14] The order also enjoined and stayed all actions against Blue Cross.
[15] This amount included the interest that should have been earned on the original one million dollars.
[16] The Notice of Determination also indicated that UMWA had received a voidable preferential transfer of certain monies. This issue was eventually litigated and resolved and is not part of this appeal.
[17] The record also indicates that at some point in 1991, UMWA, the Receiver and others filed an action against the officers and directors of Blue Cross. A settlement was reached in that case and approved initially by an order of the circuit court on October 2, 1992. In a separate order entered on September 1, 1993, the circuit court implemented its prior order approving the settlement. The September order indicated that UMWA would receive $225,000.00 from the settlement and that this amount "shall be deemed to be a credit against any adjudicated claim of the UMWA against the [Blue Cross] Estate."
[18] The circuit court filed an amended order because the referee initially appointed had to be replaced for reasons not indicated in the record. It should also be pointed out that other parties who had objected to rulings by the Receiver were also part of the proceeding before the referee, but are not involved in this appeal. See State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc., 203 W.Va. 690, 510 S.E.2d 764 (1998) (appeal by other parties).
[19] During the litigation before the referee, UMWA abandoned its claim that the money represented a special deposit claim. UMWA took the position that the money it had given to Blue Cross was a trust or secured claim.
[20] See supra note 3 for a discussion regarding the repeal of this statute.
[21] The final order stated that "[t]here appears to be no genuine issue of material fact and summary judgment is [the] appropriate remedy under Rule 56 under the West Virginia Rules of Civil Procedure."
[22] To be clear, the record on appeal does not contain any transcript of oral testimony taken before the referee or circuit court. Therefore, the referee's credibility findings are not entitled to deference. See Ware v. Howell, 217 W.Va. 25, 28-29, 614 S.E.2d 464, 467-68 (2005) (per curiam) ("[D]eference evaporates when a credibility determination is made from testimony presented in a deposition. This is because in reviewing evidence presented through deposition testimony, 'all impressions of . . . credibility are drawn from the contents of the evidence, and not from the appearance of witnesses and oral testimony at trial.'"(quoting Wells v. Tennessee Bd. of Regents, 9 S.W.3d 779, 783-84 (Tenn.1999))).
[23] It will be noted that, under the decisions of this Court, when a circuit court grants summary judgment, it must issue an order that contains findings of fact, as well as conclusions of law. See Syl. pt. 3, Fayette County Nat'l Bank v. Lilly, 199 W.Va. 349, 484 S.E.2d 232 (1997).
[24] To the extent that language in State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc., 203 W.Va. 690, 510 S.E.2d 764 (1998), may have suggested a different standard of review, it is disapproved.
[25] It has also been correctly noted that "rulings on cross-motions for summary judgment are reviewed de novo." Franklin D. Cleckley, Robin J. Davis, Louis J. Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 56, at 1248 (2d ed.2006).
[26] Nothing in the record indicates that the trust was excluded as part of the continuation of the Emergency Care Program.
[27] The circuit court also found that "[t]he creation of a sinking fund negates any argument the parties intended to create a trust relationship [after the termination of the formal written trust agreement]." This conclusion is wrong as a matter of law. The record indicates, and the circuit court so found, that the creation of the sinking fund was unilateral on the part of Blue Cross. UMWA did not agree to reacquiring the one million dollars at the conclusion of deposits in a sinking fund. On the contrary, the record shows that UMWA demanded the corpus of the trust in full as required when the trust agreement expired on April 30, 1990. Blue Cross could not unilaterally alter the requirement that the corpus of the trust be returned at the end of the trust period. See Restatement (Third) of Trusts § 64, at 467 ("[T]he trustee . . . of a trust [has] only such power to terminate the trust or to change its terms as is granted by the terms of the trust.").
[28] The record does not disclose whether the informal extension of the last formal written trust agreement was done orally or in writing.
[29] See W.Va.Code § 36-1-6 (1931) ("No declaration of trust of any personal property, without consideration, shall be valid unless it be in writing, signed by the person who creates such trust or by his agent. This section shall have no application to a conveyance of personal property to another person, in trust either for the person making such conveyance, or for a third person.").
[30] It should also be noted that, consistent with our statute and prior case law, the majority of jurisdictions permit a trust in personalty to be created in writing, orally or by conduct. See Gordon v. Central Park Little Boys League, 270 Ala. 311, 119 So.2d 23, 27 (1960); Haines v. Goldfield Prop. Owners Ass'n, 2006 WL 1160648 (Ariz.Ct.App.2006); Moore v. Lawrence, 252 Ark. 759, 480 S.W.2d 941, 945 (1972); In re Marriage of Barneson, 69 Cal.App.4th 583, 81 Cal.Rptr.2d 726, 732 (1999); Crown Life Ins. Co. v. Haag Ltd. P'ship, 929 P.2d 42, 45 (Colo.Ct.App.1996); McDonald v. Hartford Trust Co., 104 Conn. 169, 132 A. 902, 908 (1926); Bodley v. Jones, 32 A.2d 436, 438 (Del.1943); Zuckerman v. Alter, 615 So.2d 661, 663 (Fla.1993); Kam Oi Lee v. Fong Wong, 57 Haw. 137, 552 P.2d 635, 639 (Haw.1976); Kite v. Eckley, 48 Idaho 454, 282 P. 868, 870 (Idaho, 1929); Wolters v. Johnson, 114 Ill.App.3d 546, 70 Ill.Dec. 342, 449 N.E.2d 216, 217 (1983); Voelkel v. Tohulka, 236 Ind. 588, 141 N.E.2d 344, 350 (1957); Butler v. Butler, 253 Iowa 1084, 114 N.W.2d 595, 612 (Iowa 1962); Wehking v. Wehking, 213 Kan. 551, 516 P.2d 1018, 1020 (1973); Quinlan v. Quinlan, 293 Ky. 565, 169 S.W.2d 617, 620 (1943); Rose v. Osborne, 133 Me. 497, 180 A. 315, 317 (1935); Jones v. Hamilton, 211 Md. 371, 127 A.2d 519, 524 (1956); Cooney v. Montana, 347 Mass. 29, 196 N.E.2d 202, 206 (1964); Osius v. Dingell, 375 Mich. 605, 134 N.W.2d 657, 660 (1965); Salscheider v. Holmes, 205 Minn. 459, 286 N.W. 347, 349 (1939); In re Estates of Gates, 876 So.2d 1059, 1063 (Miss.Ct. App.2004); Penney v. White, 594 S.W.2d 632, 641 (Mo.Ct.App.1980); Stagg v. Stagg, 90 Mont. 180, 300 P. 539, 543 (1931); Simon v. Simon, 141 Neb. 839, 5 N.W.2d 140, 142 (1942); Barrett v. Cady, 78 N.H. 60, 96 A. 325, 329 (1915); Livingston v. Rein, 133 N.J. Eq. 585, 33 A.2d 840, 842 (1943); McDermott v. Sher, 59 N.M. 142, 280 P.2d 660, 665 (N.M.1955); Blanco v. Velez, 295 N.Y. 224, 226, 66 N.E.2d 171 (1946); Guy v. Guy, 104 N.C.App. 753, 411 S.E.2d 403, 405 (1991); Berry v. Evendon, 14 N.D. 1, 103 N.W. 748, 750 (1904); Hoffman v. Vetter, 117 Ohio App. 233, 192 N.E.2d 249, 252 (Ohio Ct.App. 1962); Matter of Estate of Stokes, 747 P.2d 300, 302 (Okla.1987); Mowrey v. Jarvy, 228 Or. 96, 363 P.2d 733, 739 (1961); In re Trbovich's Estate, 488 Pa. 583, 413 A.2d 379, 380 (1980); McElveen v. Adams, 108 S.C. 437, 94 S.E. 733, 734 (S.C.1917); Warren v. Lincoln, 58 S.D. 196, 235 N.W. 597, 600 (1931); McDowell v. Rees, 22 Tenn.App. 336, 122 S.W.2d 839, 844 (1938); Ballard v. Ballard, 296 S.W.2d 811, 816 (Tex.Ct. App.1956); Jensen v. Howell, 75 Utah 64, 282 P. 1034, 1035 (1929); Mahoney v. Leddy, 126 Vt. 98, 223 A.2d 456, 459 (1966); Russell's Ex'rs v. Passmore, 127 Va. 475, 103 S.E. 652, 658 (1920); Rogich v. Dressel, 45 Wash.2d 829, 278 P.2d 367, 372 (1954); In re Woehler's Estate, 196 Wis. 301, 220 N.W. 379 (Wis.1928); Meima v. Broemmel, 117 P.3d 429, 445 (Wy.2005).

The statutes in five states require an express trust in personalty be set out in writing. See Alaska Code § 09.25.010(a)(9) (1989) (requiring writing) (no case construing); Nev. Rev. St. § 111.235 (1929) (same); Hayes v. Clark, 242 Ga.App. 411, 530 S.E.2d 38, 39 (2000) (statute requires express trust in personalty be in writing); In re Succession of Gore, 931 So.2d 1150, 1154 (La.Ct.App.2006) (same); Desnoyers v. Metropolitan Life Ins. Co., 108 R.I. 100, 272 A.2d 683, 688 (1971) (same).
[31] If the trust had expired on April 1, 1989, and Blue Cross had refused to turn over the corpus and interest, UMWA still would have had at least two years within which to file an action to recover its money. See Vorholt v. One Valley Bank, 201 W.Va. 480, 483, 498 S.E.2d 241, 244 (1997) ("[I]t has been recognized . . . that once a trust terminates by its own terms, the activities of the trustee become subject to the running of the statute of limitations.").
[32] The plaintiff also sued the insurer, but that issue is not relevant here.
[33] Although the Court found that the plaintiff had a trust, the case was remanded for a determination of what funds were available to pay the plaintiff and other beneficiaries of trusts that were held by the bank.
[34] "Tracing was a creation of equity and has remained almost entirely the sole province of equity." George E. Palmer, The Law of Restitution, § 2.14., at p. 177 (1978).
[35] See supra note 3 for a discussion of the repeal of W. Va.Code § 33-24-27.
[36] There has been no assertion that UMWA's claim was that of a policyholder.
[37] The distinction between a trust and a debt owed to a creditor has been commented upon as follows:

A debt is a contractual obligation of one person to pay a fixed sum of money to another. The difference between a trust and a debt . . . lies chiefly in the fact that the beneficiary of a trust has a beneficial interest in the trust property and the creditor has merely a personal claim against his debtor. A debt is not a trust and involves no fiduciary relationship or duty.
Farmers State Bank of Fosston v. Sig Ellingson & Co., 218 Minn. 411, 16 N.W.2d 319, 322-23 (1944).
[38] "This method is also used in the area of secured transactions to trace proceeds of the sale of collateral in commingled funds in the hands of a debtor or to a debtor's transferee not in the ordinary course of business." United States v. Banco Cafetero Panama, 797 F.2d 1154, 1159 (2nd Cir.1986).
[39] An illustration of the third outcome is provided by the Restatement as follows:

A is trustee for B of $1000. He deposits this money together with $1000 of his own in a bank. He draws out $1500 and dissipates it. He later deposits $1000 of his own in the account. B is entitled to a lien on the account for $500, the lowest intermediate balance.
Restatement (Second) of Trusts § 202, at 451. It should be noted that the Restatement provides an exception to the third possible outcome of the test:
Where the trustee deposits trust funds in his individual account in a bank, and makes withdrawals from the deposit and dissipates the money so withdrawn, and subsequently makes additional deposits to his individual funds in the account, manifesting an intention to make restitution of the trust funds withdrawn, the beneficiary's lien upon the deposit is not limited to the lowest intermediate balance.
Restatement (Second) of Trusts § 202, at 453 (emphasis added). Accord Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville, 358 F.Supp. 317, 326 (E.D.Mo.1973).
[40] The Treasury Bonds were encumbered by a margin loan with an investment firm. The Receiver instructed the investment firm to sell the bonds. The bonds were sold for $6,313,315.22. The investment firm took its margin loan from the proceeds of the sale of the bonds, and remitted to the Receiver the remaining sum of $1,035,592.62.
[41] We make this determination based upon Blue Cross' withdrawal of $5,500,000.00 from its general operating account on June 11, 1986, and subsequent investment of the same with three separate investment firms. In its brief, the Receiver contends that, during the trust period, Blue Cross' general operating account and investment portfolio had a balance of less than one million dollars. We are not concerned with the balance in the general operating account because that is not the focus of the trace. As to the investment portfolio, the Receiver indicated that an expert it retained issued a report stating that the account which held the seven bonds was less than one million dollars at various times. In reviewing this report, we find that the expert rendered such an opinion only after discounting for a purported bank lien of $5,700,000.00. We reject the Receiver's attempt to show that the investment portfolio was less than a million dollars at various times due to an alleged lien, because, in point of fact, the portfolio was also encumbered by UMWA's trust. In other words, we do not look at any purported encumbrances on funds in the portfolio for the purpose of determining whether the portfolio was below one million dollars.
[42] We are not concerned with the sinking fund established by Blue Cross, because UMWA did not agree to the establishment of such fund.
[43] The Receiver has also argued that tracing should be precluded because the investment portfolio was used as collateral for at least two institutions, and that the rights of current secured creditors would be adversely affected. UMWA points out that this convoluted contention was not relied upon by the circuit court in rendering its decision and is therefore not properly part of this appeal. We agree. See Syl. pt. 1, Mowery v. Hitt, 155 W.Va. 103, 181 S.E.2d 334 (1971) ("In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken.").
[44] During oral argument, the parties indicated that the bonds were not the subject of any other trust.
[45] Although the bonds were subject to a margin loan, this fact did not remove the bonds as property of Blue Cross.
[46] As previously indicated, the Receiver obtained the sum of $1,035,592.62, as a result of the sale of the bonds. UMWA contends that it is entitled to $901,902.17 from the proceeds recovered from the sale of the bonds, because this would reflect one-seventh of the total purchase price of the seven bonds. We disagree.

The fact that the bonds were sold for less than their face value is of no consequence in determining the recovery of UMWA's one million dollars, plus the investment interest it was entitled to receive. Insofar as the Receiver obtained $1,035,592.62 from the sale of the bonds, all of that amount is subject to UMWA's claim for the corpus of the trust, one million dollars, and the accrued interest on the trust in the amount of $88,148.13. Further, and contrary to the urging of the Receiver, the $225,000.00 (plus any interest received) UMWA received from its action against officers and directors of Blue Cross is to be offset from the full amount of UMWA's claim, not the lesser amount of the proceeds obtained from the sale of the bonds. Finally, UMWA is entitled to receive all interest earned on the proceeds from the sale of bonds while such proceeds were in the possession of the Receiver.